**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTHOUSE RESOURCES INC., *et al.*,[1] | ) | Case No. _____ |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF DARIN T. ADLARD IN SUPPORT OF CHAPTER 11 PETITION**
**AND FIRST DAY MOTIONS**

I, Darin T. Adlard, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that:

1.       I am the Vice President of Finance and Accounting and Treasurer of Lighthouse Resources Inc., a corporation organized under Delaware law ("Lighthouse" and together with the Lighthouse Subsidiaries (defined below), collectively the "Debtors").

2.       I joined the Debtors' finance team in 2010 as the Controller, and I have played an active role in the acquisition, transition, and development of Lighthouse's financial operations. In 2013, I assumed the role of Vice President of Finance and Accounting, where I report to the President/CEO and Board of Directors for the Debtors. I am exclusively responsible for finance, accounting, risk, and treasury functions. I am the key participant in all fundraising activities with existing and potential investors, deriving models and projections to evaluate source and use of funds, valuations, and strategy. I hold a Master in Professional Accountancy degree from the University of Utah and I am a certified public accountant.

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Lighthouse Resources Inc. (4713), LHR Coal, LLC (4799), KCP, Inc. (2558), Big Horn Coal Company (7087), Rosebud Coal Sales Company (9016), KCP Properties, Inc. (8372), Decker Holding Company, LLC (8881), Decker Coal Company, LLC (3731), Montana Royalty Holdings, LLC (1107), LHR Infrastructure, LLC (9619), Millennium Bulk Terminals-Longview, LLC (0354), Barlow Point Land Company, LLC (1398), Columbia Land Company, LLC (6826), and Gulf States Bulk Terminal, LLC (5870). The location of the Debtors' service address in these chapter 11 cases is 10980 South Jordan Gateway, South Jordan, Utah 84095.

3.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

4.      All facts and opinions set forth in this declaration (this "Declaration") are based upon: (i) my knowledge of the Debtors' day-to-day operations, business and financial affairs, books and records, and employees; (ii) information I learned from my review of relevant documents; (iii) information supplied to me or verified by other members of the Debtors' management and their third-party advisors; and/or (iv) my experience and knowledge concerning the mining industry generally. Unless otherwise indicated, any financial information contained in this Declaration is unaudited and subject to change, but is accurate to the best of my knowledge. Such financial information is presented on a consolidated basis for the Debtors, except where specifically noted.

5.      The Debtors have filed certain contemporaneous motions seeking "first day" relief (collectively, the "First Day Motions") to minimize possible adverse effects of the chapter 11 filings on the Debtors' businesses. I have reviewed the First Day Motions, and I believe that the relief they request is necessary to avoid immediate and irreparable harm to the Debtors' businesses, estates, and stakeholders resulting from the filing of these chapter 11 cases (the "Cases"). As set forth herein and described in greater detail in the First Day Motions, I also believe that without immediate access to cash collateral, and authority to make certain essential prepetition payments and otherwise continue conducting ordinary course business operations, the Debtors would suffer immediate and irreparable harm to the detriment of their businesses, estates, and stakeholders.

6.      I am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I would testify competently to the facts and opinions set forth herein.

7.      To familiarize the Court and the parties in interest with Debtors, their business, and the circumstances leading to these Cases, this Declaration is divided into four parts. **Part I** provides background information on the Debtors and detailed information on the Debtors' operations. **Part II** provides an overview of the Debtors' prepetition capital structure. **Part III** describes the significant distress presently affecting the coal mining industry generally and its effects on the Debtors, certain challenges specific to the Debtors, and strategies the Debtors have implemented in response to such challenges. **Part IV** summarizes the relief requested in and the factual bases supporting the First Day Motions and other material filings filed on the Petition Date.

I.      **Debtors' Background**

8.      Each of the Debtors were either formed or acquired by Ambre Energy Ltd. of Brisbane, Australia, under the parent entity of Ambre Energy North America, Inc. between 2008 and 2015.

9.      In 2015, the name was changed from Ambre Energy North America, Inc. to Lighthouse Resources Inc.

10.     The Debtors' flagship project is providing a trade route for coal mined from the Rocky Mountain region for delivery as a chief energy source for Asia from a port on the United States West Coast.

A.      **The Debtors' Organizational Structure**

11.     While certain names and entities have changed since the inception of the company or following their acquisition, the Debtors' current organizational structure consists of 14 active

3

and inactive entities with assets or operations generally related to the coal mining industry. A full corporate organization chart is attached as *Exhibit 1*.

12.     Lighthouse, a Delaware corporation, is headquartered in South Jordan, Utah and is the ultimate parent company of the following subsidiaries.

13.     LHR Coal, LLC ("LHR Coal") is a Delaware limited liability company wholly owned by Lighthouse. LHR Coal owns various subsidiaries with coal-related assets:

        a.      KCP, Inc. ("KCP") is as Delaware corporation wholly owned by LHR Coal. KCP is a 50% owner of a joint venture known as Black Butte Coal Company ("Black Butte"). KCP is also the manager of Black Butte. KCP does not have any other assets, does not have employees, and is not otherwise a direct party to any agreements associated with Black Butte.

        b.      Big Horn Coal Company ("Big Horn") is a Wyoming corporation wholly owned by LHR Coal. Big Horn owns an inactive mine known as the Big Horn coal mine in the northern Powder River Basin in Sheridan County, Wyoming, which is in the final stages of environmental reclamation ("Big Horn Mine"). Big Horn's assets, consisting mostly of owned surface rights and certain rights from third parties, will be sold for development or other purposes.

        c.      Rosebud Coal Sales Company ("Rosebud") is a Wyoming corporation wholly owned by LHR Coal. Rosebud owns the Rosebud coal mine ("Rosebud Mine") located in the Hanna Basin, Carbon County, Wyoming, which has been fully reclaimed and now consists solely of approximately 220 acres of owned surface rights.

4

d.      KCP Properties, Inc. ("KCP Properties") is a Delaware corporation wholly owned by LHR Coal. KCP Properties owns approximately 3,500 acres of surface estate north of Sheridan, Wyoming, directly adjacent to Big Horn.

e.      Decker Holding Company, LLC ("Decker Holding") is a Delaware limited liability company wholly owned by LHR Coal. Decker Holding owns Decker Coal Company, LLC ("Decker Coal") and Montana Royalty Holdings, LLC ("Montana Royalty").

i.      Decker Coal is a Montana limited liability company. Decker Coal owns approximately 12,000 acres of permitted surface estate located in Big Horn County (the "Decker Mine").

ii.     Montana Royalty is a Montana limited liability company. Montana Royalty owns a large portion of the surface estate for the Decker Mine.

14.     LHR Infrastructure, LLC ("LHR Infrastructure") is a Delaware limited liability company and is wholly owned by Lighthouse. LHR Infrastructure owns Millennium Bulk Terminals-Longview, LLC ("MBTL") and Gulf States Bulk Terminal, LLC ("Gulf States").

a.      MBTL is a Delaware limited liability company wholly owned by LHR Infrastructure. MBTL owns certain upland improvements, leases land, and operates a dock on the adjacent aquatic lease on the Columbia River in Longview, Washington (the "Millennium Facility"). MBTL also owns Barlow Point Land Company, LLC ("Barlow Point") and Columbia Land Company, LLC ("Columbia").

i.      Barlow Point is a Delaware limited liability company. Barlow Point owns undeveloped shoreline and tidelands on the Columbia River.

5

        ii.   Columbia is a Delaware limited liability company. Columbia owns approximately 100 acres of agricultural land which is currently leased to tenants for agricultural purposes.

    b.     Gulf States is a Delaware limited liability company, which was organized for the intended purpose of developing a port project along the Gulf of Mexico. The project is not proceeding, and Gulf States currently does not have any operations or assets.

15.    Lighthouse Products LLC ("LH Products") is a Delaware limited liability company owned by Lighthouse. LH Products markets, sells, and delivers products to its customers. It facilitates the export of coal from the Decker Mine to Asia by contracting with Asian customers and a rail carrier and port in British Columbia to sell, transport, and transload coal. Lighthouse Products is not a debtor in these cases.

16.    Gulf States, Columbia, Barlow Point, MBTL, LHR Infrastructure, Montana Royalty, Decker Coal, Decker Holding, KCP Properties, Rosebud, Big Horn, KCP, and LHR Coal are collectively referred to herein as the "Lighthouse Subsidiaries."

17.    As noted above, over the years some of the Debtors have changed names. Various documents in this case (e.g., loan agreements, executory contracts, unexpired leases) may reference a Debtors' prior name. Thus, for ease of reference, the prior names are as follows:

    a.     Prior names of Lighthouse Resources Inc:

        i.   Ambre Energy, North America, Inc., and

        ii.   AE Group Holdings, Inc.

    b.     Prior names of LHR Coal, LLC:

        i.   AE Coal, LLC,

        ii.   AE Coal, Inc.,

> iii.  Eldorado Coal, Inc., and
>
> iv.  AE Wind River, LLC

c.     Prior names of LHR Infrastructure, LLC:

> i.  AE Infrastructure, and
>
> ii.  Millennium Bulk Logistics, Inc.

d.     Prior name of LHR Coal Marketing, LLC: AE Coal Marketing, LLC

e.     Prior name of Montana Royalty Holding, LLC: Montana Royalty Co

f.     Prior name of Decker Holding Co., LLC: Decker Coal Inc.

g.     Prior name of Decker Coal Company, LLC: Decker Coal Company

**B.    The Debtors' Operations**.

18.    As previewed above and discussed in more detail below, the coal-side Debtors, LHR Coal and its subsidiaries, operate the Decker Mine in Montana, and LHR Coal subsidiary, KCP, is a fifty percent (50%) owner of the Black Butte joint venture that mines coal in Wyoming. The Debtors produce subbituminous thermal coal with low sulfur content, which they sell to domestic and foreign markets, with a foreign focus on Asia. Thermal coal is primarily consumed by electric utilities and industrial companies as fuel for electricity generation.

19.    The non-coal Debtors, LHR Infrastructure and its subsidiaries, also operate the Millennium Facility in Washington State.

*1.  Decker Mine*

20.    The Decker Mine is situated in the northwestern section of the Powder River Basin in Big Horn County, Montana, approximately twenty-five (25) miles north of Sheridan, Wyoming (the "Decker Mine").

7

21.     The Decker Mine contains approximately 12,000 acres of land permitted for coal mining. Two mines operate concurrently: (i) the East Decker Mine consists of 4,361 permitted acres, and (ii) the West Decker Mine consists of 7,356.8 permitted acres.

22.     Decker Coal and Montana Royalty own the approximately 16,000 acres of the surface estate of the Decker Mine. The Decker Mine mineral rights are leased, with the majority of the mineral estate the subject of federal (Bureau of Land Management, "BLM") mineral leases.

23.     Decker Coal is a party to a Master Coal Purchase and Sale Agreement with DTE Electric Company effective December 10, 2003 and a Confirmation Letter effective February 4, 2015 (collectively, the "DTE Sales Agreement"). Pursuant to the DTE Sales Agreement, Decker Coal ships 2.5 million tons of coal per year from the Decker Mine to DTE from January 1, 2016 through the beginning of 2021. DTE pays Decker Coal for that coal at a per-ton price established by the DTE Sales Agreement, which is currently $15.25 per ton.

*2.  KCP's Interest in the Black Butte Coal Company*

24.     KCP is a party to a Joint Venture Agreement with non-debtor entity Bitter Creek Coal Company ("Bitter Creek"), which is a subsidiary of Anadarko Petroleum Corporation (a subsidiary of Occidental Petroleum). Pursuant to the Joint Venture Agreement, KCP and Bitter Creek each own 50% of the joint venture, Black Butte. Black Butte operates an open cut (surface) mine in the Green River Basin, located in Sweetwater County, Wyoming. KCP has management rights and oversees the operations at Black Butte, for which it receives management fees.

25.     KCP's only asset is its ownership interest and rights created under the Black Butte Joint Venture Agreement with Bitter Creek. KCP does not have any other assets, does not have

employees, and is not otherwise a direct party to any agreements associated with Black Butte. Black Butte is not a debtor in these proceedings, nor is Bitter Creek.

### 3. Millennium Facility

26.     MBTL (i) owns certain improvements, (ii) leases land, and (iii) operates on an aquatic lease with an existing dock and allowing for two additional docks, known as the Millennium Facility, as follows:

a.      MBTL owns certain assets, including buildings, improvements, equipment, rolling stock, and vehicles.

b.      MBTL leases 540 acres of land from Northwest Alloys, Inc. (a wholly owned subsidiary of Alcoa) (the "Northwest Alloys") under a ground lease with a 60-year primary term with two 10-year renewal options that was executed in 2011.

c.      MBTL operates on the aquatic lands as the operator for Northwest Alloys under its Aquatics Land Lease with the Washington Department of Natural Resources (the "Aquatics Land Lease"). The aquatic lease was issued to Northwest Alloys in 2008 and has a 30-year term.

d.      MBTL operates the upland facility as a rail transloading facility and leases space to various tenants. It also has the exclusive right to develop a business to upload, handle, transship, and store various cargoes, including as a coal export terminal for the Decker Mine and other customers.

27.     The Millennium Facility is being redeveloped and expanded into a port facility for coal exports and other bulk materials, which would expand coal exports to Asia from the United States. While demand for thermal coal in the United States is declining, thermal coal demand in Asia has been growing. The high-efficiency, low emissions power plants now under construction

9

in the Indo-Pacific Region would require those countries to import millions of tons of thermal coal annually.

28.     As part of the redevelopment of the Millennium Facility, the Debtors began the regulatory process of developing 190-acres of that property into a coal export terminal (the "CET") capable of exporting 44 million metric tons of coal, which would satisfy the export requirements of Debtors and provide export capacity to third party shippers.

29.     In September 2017, Washington State Department of Ecology denied a 401 Water Quality Certification ("401") "with prejudice" for the CET on non-water-quality grounds. Upon information and belief, no other project has been denied a request for 401 Water Quality Certification "with prejudice." Lighthouse appealed Washington State's 401 denial and the appeal is pending in Washington state court.

30.     On January 3, 2018, Lighthouse, LH Products, LHR Infrastructure, LHR Coal, and MBTL also filed suit against Jay Inslee, in his official capacity as Governor of the State of Washington; Maia Bellon, in her official capacity as Director of the Washington Department of Ecology; and Hilary S. Franz, in her official capacity as Commissioner of Public Lands in the United States District Court for the Western District of Washington ("Federal District Court"), Case No. 3:18-cv-05005, for declaratory and injunctive relief ("MBTL Federal Case").

31.     The MBTL Federal Case asserts that Governor Inslee and his administration blocked coal mined in Wyoming, Montana, and other western sister states from being exported through the Millennium Facility on policy grounds, in violation of the Commerce Clause and other federal statutes.

32.     Lighthouse's rail carrier, BNSF Railway Company, intervened as a plaintiff in the MBTL Federal Case with interests aligned with Lighthouse. Several environmental groups,

including the Sierra Club and the Washington Environmental Council have intervened as defendants.

33.     Just weeks before the scheduled trial, the Federal District Court stayed the MBTL Federal Case to await decisions in the state court proceedings.

34.     Lighthouse appealed the Federal District Court's stay decision to the United States Court of Appeals for the Ninth Circuit (Case No. 19-35415). The MBTL Federal Case has been fully briefed and oral argument was heard before the Ninth Circuit on October 8, 2020.

35.     Though not a party to the case, Lighthouse may benefit from the case brought by the States of Montana and Wyoming against the State of Washington as an Original Action filed on January 24, 2020 in the U.S. Supreme Court (Case No. 22O152). The complaint asserts that Washington State is unlawfully blocking coal exports with the effect of threatening the receipt of taxes by Wyoming and Montana to fund critical state and local infrastructure and programs and impeding federal energy and security policies. Seventeen states filed an amicus curiae brief in support of Montana and Wyoming. On October 5, 2020, the U.S. Supreme Court issued an order inviting the acting Solicitor General to file a brief expressing the views of the United States in this case.

36.     Venable LLP represents Lighthouse in the Ninth Circuit appeal, and the Debtors will likely be moving to retain Venable as an ordinary course professional to address any additional matters related to the pending appeal in the MBTL Federal Case.

### 4. Inactive Mines- Big Horn and Rosebud

37.     The Big Horn Mine is located in the northern Powder River Basin in Sheridan County, Wyoming, approximately six (6) miles north of the town of Sheridan and fifteen (15) miles southwest of the Decker Mine. The Big Horn Mine is owned by Big Horn and is in the

final stages of environmental reclamation. Reclamation and other mine closure activities are coordinated by KCP.

38.     The majority of the property pertaining to the Big Horn Mine has been reclaimed and has received final bond release from the State of Wyoming. The remaining 24 acres of "disturbed land" has been rezoned to Industrial Light I-2 with Sheridan County, and all that is remaining is a land use change with the Wyoming Department of Environmental Quality. Upon completion of the land use change, the mining permit will be terminated, and all bonding liability associated with Big Horn Coal will be released and go to zero.

39.     Big Horn also owns about 6,300 acres of surface ownership. The majority of this surface is under existing grazing leases with 2 main lessees. Two houses exist on the Big Horn surface and are occupied by tenants. The Big Horn Shop, Rail Spur, and Bridge are considered main assets and are utilized by various parties for industrial purposes. The Shop is currently sub-leased by Decker Coal for equipment storage and maintenance. The rail spur siding is subleased by DTE for rail car storage. Big Horn also holds mining rights to two State of Wyoming Coal Leases totaling approximately 760 acres and containing approximately 90 million recoverable tons of coal.

40.     The Rosebud Mine is located in Carbon County, Wyoming, north of Hanna in the Hanna Basin. The Rosebud Mine is owned one hundred percent (100%) by Rosebud. The Rosebud mine has been fully reclaimed and all related property interests and mine permits were terminated in early 2014.

41.     Rosebud owns approximately 220 acres of surface ownership, of which 219 acres is considered rangeland. There are no lessees or grazing leases upon these areas. The remaining 1

12

acre of surface ownership consists of vacant lots and alleys inside the town of Elmo, Wyoming located adjacent to the town of Hanna, Wyoming.

### C.    The Debtors' Management and Employees

42.    The Debtors have retained BDO Consulting Group, LLC ("BDO") to provide restructuring assistance to the Debtors, as well as to provide Robert Novak as the Debtors' Chief Restructuring Officer ("CRO"), including support staff to assist Mr. Novak in his position as CRO.

43.    Robert Novak is a Managing Director with BDO in its business restructuring and turnaround services practice. Mr. Novak has over 20 years of experience in crisis management, operations improvement and debt restructuring to the firm's Chicago office. He has held multiple C-level positions and worked with debtors and lenders in numerous industries including mining and metals, manufacturing and healthcare. Prior to his role as CRO, Mr. Novak has worked closely with the Debtors and their management for the three months leading up to the Chapter 11 Case, assisting, among other things, with the Debtors' finances, budgeting, negotiations regarding financing and potential sales of assets. Mr. Novak and BDO have become intimately familiar with the Debtors' business and finances during this time, as well as the restructuring efforts and plans discussed in Section III, below.

44.    In addition to Mr. Novak as the CRO, the Debtors have an experienced management team that is currently comprised of the following members ("Management Team"):

| Name | Years with the Debtors | Title |
|------|------------------------|-------|
| Darin Adlard | 10 | Vice President of Finance & Accounting, Treasurer |
| Tay Tonozzi | 10 | Chief Operating Officer |
| Michael Klein | 9 | Vice President of Legal & Business Development |
| Dean Brockbank | 3 | Vice President & General Counsel, Secretary |

13

45.     Prior to the Petition Date, the Workforce included approximately 167 employees at Lighthouse, MBTL, and Decker Coal (the "Employees"). On December 2, 2020, however, the Debtors' financial situation necessitated the termination of certain Employees, leaving only 91 total Employees as of the Petition Date.

46.     Approximately 11 of the Employees are employed by Lighthouse (the "LRI Employees") to perform administrative functions for the Debtors.  The LRI Employees work at the Debtors' headquarters in South Jordan, Utah.

47.     MBTL employs 21 employees (the "MBTL Employees"), which are comprised of office employees, managers, and employees that maintain operations and facilities at MBTL.

48.     Decker Coal employs both union and non-union employees (the "Decker Employees"). As of the Petition Date, there are 40 union employees at Decker Coal (the "Union Employees") who work directly in mining operations at the Decker Mine. The 19 non-union employees at Decker Coal serve as managers, supervisors, office employees, and other field-supporting roles at the Decker Mine (the "Non-Union Employees"). Decker Coal also retains independent contractors at the Decker Mine.

49.     The Union Employees at Decker Coal are covered by collective bargaining agreements (the "CBAs")[2] between Decker Coal and the International Union, United Mine Workers of America ("UMWA"). The Non-Union Employees are not covered by collective bargaining agreements.

50.     The Debtors have formulated an Incentive Plan for certain key Employees, including members of Management and non-management Employees based on a number of benchmarks, including those based on cash flow and production metrics, as well as achieving

---

[2]     Descriptions in this motion of the CBAs are intended only as a summary and may be subject to exceptions or conditions set forth in the CBAs. To the extent of a conflict between this motion and the terms of a CBA, the terms of the applicable CBA shall control.

confirmation of a chapter 11 plan. The payments shall be specifically conditioned upon continued employment. The Debtors are filing a motion to approve their Key Employee Incentive Program ("KEIP Motion").

## II.     The Debtors' Capital Structure and Prepetition Debt.

### A.     Capital Structure.

51.     As a privately held company, Lighthouse is not listed on any public exchange. Lighthouse has Five Million (5,000,000) shares of Class A Common Stock with a par value $0.01 per share and Four Hundred Thousand (400,000) shares of Class B Non-Voting Convertible Common Stock with a par value $0.01 per share. As of the Petition Date:

   a.     A total of 4,032,955 shares of Lighthouse's Class A Common Stock have been issued and are held by the following:

      i.   Resource Capital Fund V, L.P. ("RCF V"): 2,693,973 shares;

      ii.  Resource Capital Fund, VI L.P. ("RCF VI"): 1,316,630 shares; and

      iii. RCF V Annex Fund, L.P. ("RCF V Annex"): 22,352 shares.

   b.     350,691 shares of Class B Non-Voting Convertible Common Stock have been issued and are held by AE Minerals Pty Limited.

52.     The ownership of the Lighthouse Subsidiaries is set forth in Section I.A., above.

### B.     Prepetition Debt.

53.     As of the Petition Date, the Debtors' funded debt liabilities total approximately $455,754,717.89. The following table depicts the Debtors' prepetition debt structure:

| Debt | Approx. Balance |
|------|-----------------|
| Prepetition Loans : | |
| -   RCF V ($55MM Loan) | $   56,561,388.95 |
| -   RCF VI ($60MM Loan) | $   43,089,176.70 |
| -   RCF VI ($137MM Loan) | $ 131,359,240.02 |
| -   RCF Annex ($137MM Loan) | $   10,398,912.05 |
| -   <u>RCF VI (Letter of Credit)</u> | $   <u>14,614,835.17</u> |
| Prepetition Secured Lender Subtotal | $ 256,023,552.89 |

| Equipment Financing | $   15,401,236.00 |
| Holmes Mortgage | $     1,923,304.00 |
| Computer Equipment and Servers Lease | $       362,891.00 |
| Surety/Bonding | $ 182,043,734.00[3] |
| TOTAL | $ 455,754,717.89 |

### 1. Prepetition Loans

54.     Prior to the Petition Date, Lighthouse entered into the following loan agreements with RCF V, RCF VI, and RCF V Annex (collectively, the "Prepetition Secured Lenders"), which are guaranteed by certain Lighthouse Subsidiaries. The Prepetition Secured Lenders assert a first priority lien on all of the Debtors' assets save for certain "Permitted Liens" permitted by agreement:

a.     Third Amended and Restated Loan Agreement dated December 22, 2014 between Lighthouse (f/k/a Ambre Energy North America, Inc.) as borrower and RCF V (as amended, modified, supplemented or restated from time to time), pursuant to which RCF V made loans to Lighthouse in the principal amount of Fifty-Five Million Dollars ($55,000,000) ("$55MM Loan"). The $55MM Loan is convertible; all wholly owned Lighthouse Subsidiaries are guarantors of the $55MM Loan except for MBTL, Columbia, and Barlow Point.

b.     Loan Agreement dated December 22, 2014 between Lighthouse (f/k/a Ambre Energy North America, Inc.) as borrower and RCF VI (as amended, modified, supplemented or restated from time to time), pursuant to which RCF VI agreed to make loans to Lighthouse up to the principal amount of Eighty Million Dollars ($80,000,000) ("$80MM Loan"). The $80MM Loan is convertible; all wholly owned Lighthouse Subsidiaries are guarantors of the $80MM Loan except for MBTL, Columbia, and Barlow Point. The current principal balance of the $80MM Loan is $41,899,691.00.

c.     Amended and Restated Reimbursement Agreement dated December 22, 2014, between Lighthouse (f/k/a Ambre Energy North America, Inc.) as borrower and RCF VI (as amended, modified, supplemented or restated from time to time), pursuant to which RCF VI agreed to make available letters of credit up to the aggregate amount of Sixty Million Dollars ($60,000,000) ("$60MM

---

[3]     This amount includes $52,946,814.00 in reclamation bonding for Black Butte. However, because it is cross-collateralized with the bonding for the Decker Mine, it is included. In addition to reclamation bonding for the mines this amount also includes a black lung bond, a notary bond, and a permit/license bond.

4849-7016-9548

Facility"). All wholly owned Lighthouse Subsidiaries are guarantors of the $60MM Facility except for MBTL, Columbia, and Barlow Point; the debt under the $60MM Facility is secured by the security documents related to the $137.5MM Loan. Currently, $22,000,000 in letters of credit are outstanding pursuant to the $60MM Facility, with $13,125,000 converted to a "Reimbursement Loan" as that term is defined in the $60MM Facility.

d.  Loan Agreement dated May 24, 2016, which was amended and restated on June 28, 2019, between Lighthouse (as borrower) and RCF VI and RCF Annex (as amended, modified, supplemented, extended or restated from time to time, the "137.5MM Loan Agreement;" the loans pursuant to the $137.5 Loan Agreement, the "$137.5MM Loan"), whereby RCF VI and RCF Annex loaned to Lighthouse an aggregate of One Hundred Million Dollars ($100,000,000) (the "$100MM Loan"), and RCF VI, through the June 28, 2019 amendment and restatement of the Loan Agreement and several amendments thereto, agreed to lend Lighthouse up to the principal amount of Thirty Seven Million Five Hundred Thousand Dollars ($37,500,000) (the "$37.5MM Loan"). The $100MM Loan is convertible, while the $37.5MM Loan is nonconvertible; the $137.5MM Loan is guaranteed by all Lighthouse Subsidiaries.

55.    The 137.5MM Loan Agreement, together with the $55MM Loan Agreement, the $80MM Loan Agreement, and the $60MM Facility collectively, the "Loan Agreements"; the $137.5MM Loan together with the $55MM Loan, $80MM Loan and $60MM Facility, the "Prepetition Loans").

56.    Pursuant to the Amended and Restated Subordination Agreement dated May 24, 2016 by and between RCF V and RCF VI, the $55MM Loan from RCF V is subordinated to the $137.5MM Loan from RCF VI, the $80MM Loan from RCF VI, and $60MM Facility from RCF VI.

57.    Additionally, the Intercreditor Agreement dated October 17, 2019 by and between RCF V, RCF VI, and RCF Annex (as amended, modified, supplemented or restated from time to time) designated $27.5MM of the $37.5MM Loan from RCF VI as senior secured debt having priority over all other indebtedness of the Debtors to RCF V, RCF VI, and RCF Annex.

58.     The Prepetition Loans bear interest at a rate of approximately two percent (2%) per annum. Default interest under the Prepetition Loans is equal to the contract rate plus five percent (5%).

59.     The Prepetition Loans provided for a maturity date of September 30, 2020. On October 1, 2020, RCF V, RCF VI, and RCF V Annex each sent letters to the Debtors notifying them that they deemed the Prepetition Loans, together with any accrued interest and drawn letters of credit, "due and payable as of September 30, 2020."

60.     As of December 2, 2020, the aggregate indebtedness owing by the Debtors to the Prepetition Secured Lender under the Prepetition Loans, including interest, fees, and expenses, is approximately $256,023,552.89.

61.     The Prepetition Secured Lenders assert senior priority liens on substantially all of the Debtors' assets, except for certain Permitted Liens as defined in the Loan Agreements.

*2.  Equipment Financing and Leases*

62.     Decker Coal is the obligor on several Security Agreement-Conditional Sales Contracts with Komatsu Equipment Company ("Komatsu Equipment"), which are financed and secured by Komatsu Financial Limited Partnership ("Komatsu Financial"). Decker Coal also leases equipment from Komatsu Equipment pursuant to capital leases.

63.     It is believed that Komatsu Financial will assert a purchase money security interest in the equipment subject to each Security Agreement-Conditional Sales Contract. The total principal balance owed to Komatsu Financial is approximately $15,354,170.00.

64.     On September 3, 2015, Decker Coal and Sandvik Customer Finance LLC ("Sandvik") entered into a Purchase Order for a Sandvik D75 Drill, which is secured by the drill.

18

This is a capital lease and there is one remaining payment on the lease for approximately $47,066.00, which is due in December 2020.

### 3. Computer Equipment and Servers Lease

65.     On April 28, 2017, Lighthouse and Cisco Capital Systems Corporation ("Cisco") entered into a capital lease agreement regarding various computer equipment, servers, and other hardware for Lighthouse's network. As of the Petition Date, there is a balance of $362,891.00, which is secured by the computer equipment, servers, and other hardware provided by Cisco.

### 4. Mortgages

66.     According to a purchase agreement dated July 12, 1977, Montana Royalty purchased a certain property known as the "Holmes Property" from the Holmes Family Limited Partnership, a Wyoming Limited Partnership, with an address of 136 Scott Drive, Sheridan, Wyoming 82801. Pursuant to the terms of the agreement with the seller, Montana Royalty currently owes approximately $1,923,304.00 of the purchase price, which purchase price is to be paid as the coal is mined from the Decker Mine at the rate of $0.08 per ton. Interest on this amount accrues at the rate of 6% per annum on the unpaid balance of the principal.

### 5. Surety/Bonding

67.     Because the Debtors are in the mining business, they must obtain permits and post reclamation bonds with governmental entities where they operate.

68.     The Debtors are parties to the following agreements with sureties for the bonds:

    a.     General Indemnity Agreement dated June 12, 2014, in favor of Atlantic Specialty Insurance Company and General Indemnity Agreement dated November 10, 2016, Agreement with Atlantic Specialty Insurance Company:

        i.     Indemnitors: Lighthouse, LHR Coal, LHR Infrastructure, LH Products, KCP, Big Horn, Rosebud, KCP Properties, Decker Holding, Decker Coal, and Montana Royalty.

        ii.     Secured by: $13,125,000.00 Letter of Credit issued by RCF VI.

iii. After giving notice on September 24, 2020, Atlantic Specialty Insurance Company drew on the $13,125,000.00 letter of credit posted as collateral under both agreements.

b.   General Indemnity Agreement dated June 11, 2014 in favor of Westchester Fire Insurance:

i. Indemnitors: Lighthouse, KCP, Decker Coal, and Black Butte.

ii. Secured by: $1,921,107.00 Letter of Credit issued by RCF VI.

c.   General Indemnity Agreement dated September 18, 2015 in favor of Zurich American Insurance Company:

i. Indemnitors: Lighthouse, LHR Coal, LHR Infrastructure, LH Products, KCP, Big Horn, Rosebud, KCP Properties, Decker Holding, Decker Coal, and Black Butte.

ii. Secured by: $39,718,740.00 in cash accrued by the Debtors in a bank account with BNY Mellon and a $7,500,000.00 Letter of Credit issued by RCF VI.

d.   MBTL is required to provide a $10,000,000 letter of credit under its ground lease with Northwest Alloys. The letter of credit is currently being provided through January 11, 2021 by Arch Coal n/k/a Arch Resources, Inc. ("Arch"). MBTL and Lighthouse have a contractual obligation to reimburse Arch if Northwest Alloys draws on the letter of credit.

## III.   **Events Leading to Chapter 11 Cases**

### A.   **Events Leading to Liquidity Crisis and Need for Bankruptcy Relief.**

69.   The Company has focused on sales to the Indo-Pacific Region where demand for thermal coal in Asia has been increasing and port access for coal from the West Coast of the United States has been limited.

70.   Coal from the Decker Mine is an attractive choice for Asian buyers because of its low extraction cost and consistent quality. It fits the unique requirements of new cutting-edge power plants that have more efficient operations and reduced $CO_2$ emissions.

71.   Lack of port capacity from the West Coast of the United States has restricted access from the Decker Mine and other producers in the West to growing demand in Asia.

72.     Lighthouse has been working for over eight years to permit the CET operated by MBTL. It was hoped that the CET would provide improved access for Debtors to ship their coal to Asian markets and lead to an increase in production.

73.     In the years leading up to the Petition Date, the price for thermal coal in the United States has been impacted by decreased demand in the United States and Europe.

74.     Recent prices in Asia have been impacted by the COVID-19 global pandemic with the associated decrease in industrial and business activity due to government-imposed restrictions.

75.     Due to decreased prices in Asia connected to the COVID-19 global pandemic, Decker Coal has experienced a drastic reduction in export sales this year due to an oversupplied market.

76.     Coal production in the United States for Q2 2020 was the lowest it has been in almost 50 years. (John T. Boyd Company US Quarterly Production, 2020 Third-Quarter (Preliminary) Update, attached as *Exhibit 2*.) While coal production increased in the preliminary numbers for Q3, they were still significantly lower than coal production this time in 2019. (*Id.*)

77.     Currently, the Debtors' cost to produce coal from the Decker Mine exceeds the sale price in the DTE Sales Agreement due to insufficient production volume to cover fixed costs. Continuing to operate the Decker Mine is not economically feasible.

78.     Further, DTE will no longer purchase any coal from the Debtors beyond early 2021. As of that date, the Debtors will not have a buyer for the coal at the Decker Mine. If and when mining at the Decker Mine ceases, the Debtors are obligated under various laws to start the reclamation process—a process that requires work that will not generate any income for the estates.

79.     In addition, the delay in permitting and the mounting permitting costs, including ensuing legal costs, involved with the Millennium Facility have prevented the Debtors from being able to fully develop (and use) the project and they are unable to bear any further costs associated with it.

80.     While KCP receives distributions from the Black Butte joint venture, they are insufficient to cover the Debtors' current losses from operating the Decker Mine and developing the Millennium Facility.

81.     All of the economic and regulatory issues in the thermal coal space, combined with those specific to the Debtors, have caused a liquidity crisis and the need for the relief sought in these Chapter 11 Cases.

82.     On October 1, 2020, the Prepetition Secured Lenders notified the Debtors that they would no longer provide any more funding and, as noted above, gave notice to the Debtors that they deemed the Prepetition Loans due and owing as of September 30, 2020.

83.     In the months leading up to these cases, the Debtors sought financing options as well as investigated options to sell the Decker Mine or the Millennium Facility to a third party. While the Debtors have been unable to consummate either of these transactions as of the Petition Date, I believe there is continued interest in the market for the Millennium Facility. The Debtors' broker, JLL (described below), has received a term sheet for a potential purchase of certain assets pertaining the Millennium Facility.

**B.     The Restructuring Support Agreement and Plan to Restructure.**

84.     Knowing they only had a finite amount of cash remaining, and in an effort to avoid shuttering operations and filing a chapter 7, the Debtors engaged in negotiations with their major stakeholders, the Prepetition Secured Lenders and the Debtors' Sureties, Zurich American

Insurance Company ("Zurich"), Atlantic Specialty Insurance Company ("Atlantic"), Westchester Fire Insurance ("Westchester," and together with Zurich and Atlantic, collectively the "Sureties").

85.     On December 2, 2020, the Debtors, the Prepetition Secured Lenders, and the Sureties entered into the Restructuring Support Agreement and accompanying documents and term sheets, filed as Exhibit 3 (collectively, the "RSA"). The RSA sets forth the terms of the Debtors' case timeline, funding, and liquidation plan.

86.     In principal, the RSA provides that after the filing of these chapter 11 cases the Debtors will work toward a chapter 11 plan, which upon confirmation and its effective date, only LHR Coal and its subsidiaries (the "LHR Coal Entities") will survive, and the LHR Coal Entities' membership interests and assets will vest in a reclamation trust (the "Trust") to satisfy the reclamation and environmental obligations at the Decker Mine.

87.     The Trust will establish a Decker Reclamation Plan to be approved by the State of Montana. The Decker Reclamation Plan will be administered by the Trust and will be funded by a sinking fund ("Sinking Fund").

88.     The Sinking Fund will be funded by any remaining collateral held by the Sureties ("Surety Collateral"), portions of distributions KCP receives from Black Butte, and certain proceeds from the sale of the LHR Coal Entities' assets following plan confirmation, as set forth in the RSA.

89.     In consideration for providing the use of their collateral to the Trust, the Prepetition Secured Lenders will receive distributions from the Trust. The general unsecured creditors of Lighthouse and the LHR Coal Entities will also receive pro rata distributions from the Trust in accordance with the RSA and, ultimately, any chapter 11 plan and Trust documents.

90.     Any funds remaining in the Sinking Fund will be reserved to pay KCP's share of the Black Butte reclamation costs when it ceases operation, in accordance with the RSA.

91.     As noted above, the Debtors, through their broker, Jones Lang LaSalle Americas, Inc. ("JLL"), have received a term sheet for the Millennium Facility and the Debtors intend to file a sale motion on or soon after the Petition Date to establish and begin the sale process. The Debtors intend to retain JLL as a broker in the Chapter 11 Case to list and market the Millennium Facility for a section 363 sale. Heading the JLL team is Keith Stauber, a Managing Director at JLL and based in Chicago, Illinois. Mr. Stauber is focused on leading new business efforts and expanding strategic client relationships as a senior leader with JLL's Ports, Airports and Global Infrastructure team and assists corporations and investors/owners with the development and implementation of their real estate strategies including the acquisition, disposition, development and capital market activities of facilities in the Midwest, the United States and internationally.

92.     The Debtors will also be seeking the retention of a land broker to market the Big Horn Assets, which will likely be sold as farming and ranching land, also pursuant to a section 363 sale process.

93.     With the RSA and chapter 11 plan, the Debtors and their stakeholders hope to swiftly move through the Chapter 11 Case. The Debtors are operating a self-funded case and funds will run out in March 2021. The condensed nature of the Chapter 11 Case necessary to reduce operating costs and administrative expenses and to allow the Debtors to restructure and confirm a plan prior to the time the Debtors run out of funds.

94.     Subject to modifications due to any change in circumstances, the Debtors anticipate the following timeline to confirm their chapter 11 plan:

| DATE/TIME[4] | EVENT |
|---|---|
| Dec. 3, 2020 | **Petition Date** |
| Dec. [7], 2020 | **Complete Mailing of Disclosure Statement Hearing Notice** |
| Jan. [4], 2021 at 4:00 p.m. (prevailing Eastern Time) | **Disclosure Statement Objection Deadline** |
| Jan. [6], 2021 at 4:00 p.m. (prevailing Eastern Time) | **Disclosure Statement Reply Deadline** |
| Jan. [11], 2021 | **Disclosure Statement Hearing** |
| Jan. [15], 2021 | **Complete Mailing of Plan Solicitation Package** |
| Feb. [12], 2021 at 4:00 p.m. (prevailing Eastern Time) | **Confirmation Objection Deadline** |
| Feb. [16], 2021 at 4:00 p.m. (prevailing Eastern Time) | **Confirmation Reply/Brief Deadline** |
| Feb. [19], 2021 | **Confirmation Hearing** |
| March [1], 2021 | **Effective Date** |

95.     The Debtors believe this chapter 11 plan process is in the best interests of the Debtors' creditors and parties in interest. While they reserve the right to do so, as noted in the timeline above, the Debtors do not anticipate seeking to shorten any applicable time periods for approval of their disclosure statement and confirmation of a chapter 11 plan. Accordingly, all of the Debtors' constituents will be able to participate in the process should they choose to do so.

**IV.     Evidentiary Support for First Day Motions and Related Filings.**

96.     Contemporaneously with this Declaration, the Debtors are seeking relief through a number of First Day Motions that they believe are necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these chapter 11 cases.

97.     These First Day Motions seek authority to, among other things, honor employee-related wages and benefit obligations and ensure the continuation of the Debtors' cash

---

[4]     This provides a proposed schedule, which will be subject to the Court's calendar and subject to amendment depending on the events of the Chapter 11 Case.

management systems and other business operations without interruption. I believe that the relief requested in the First Day Motions is necessary to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of their stakeholders.

98.     Several of these pleadings request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors' estates. Other relief will be deferred for consideration at a later hearing.

99.     I am familiar with the contents and substance of each First Day Motion (including the exhibits thereto), and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge. I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity to maximize value in these chapter 11 cases; and (c) best serves the interests of the Debtors' stakeholders.

100.     In addition, I will address substantive matters raised in the following First Day Motions for which I have personal knowledge regarding factual assertions about the Debtors raised in each:

      a.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to Use Cash Collateral, (II) Granting Adequate Protection to Secured Lender, (III) Scheduling Final Hearing, and (IV) Granting Related Relief* ("Cash Collateral Motion");

b.  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimburse Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* ("Employee Wages and Benefits Motion");

c.  *Debtors' Motion for Entry of Interim and Final Orders (a) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (b) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (c) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (d) Granting Related Relief* ("Utilities Motion");

d.  *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (ii) Granting Related Relief* ("Tax Motion");

e.  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Maintain Existing Business Forms, and (C) Perform Intercompany Transactions, and (II) Granting Related Relief* ("Cash Management Motion"); and

f.  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief* ("Critical Vendor Motion").

**A.    Cash Collateral Motion**

101.    In preparation for this chapter 11 filing, the Debtors initiated two parallel processes for identifying sources of capital on the best available terms: (a) negotiations with the Debtors' existing funded debt stakeholders and (b) a marketing process with potential alternative sources of capital from parties outside the Debtors' existing capital structure.

102.    The Prepetition Secured Lenders declined to provide any additional funding and as of the Petition Date, the Debtors have been actively seeking and negotiating term sheets with other potential lenders.

103.    As of the Petition Date, the Debtors have $1,158,364.25 in cash on hand and have an immediate need to access liquidity, and absent access to their cash collateral, will not be able to continue operations.

27

104.     The Debtors have filed a motion to allow them to use their cash collateral.

105.     As part of our evaluation of the Debtors' liquidity position, I reviewed, analyzed and assisted in the development of the Debtors' 13-week cash flow forecast, and reviewed and analyzed the Debtors' long-term cash flow forecasts. These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including the effect of the chapter 11 filing on the operations of the business professional fees, and required operational payments.

106.     The use of funds received from DTE and sale of the final tons of coal, as well as funds received as distributions and management fees from Black Butte will provide the Debtors with enough cash to operate through the beginning of March 2021.

107.     The Debtors believe their available cash will allow them to operate through the confirmation and effective date of a chapter 11 plan and at this time, the Debtors do not plan to obtain post-petition financing.[5]

108.     Absent the use of cash collateral and the cooperation of key business partners at this critical early stage, the Debtors could lose support from important stakeholders on whom the Debtors' business depends—which, in turn, would hinder the Debtors' ability to maximize the value of their estates through a chapter 11 sale of some or all of their assets.

109.     A significant portion of the Debtors' assets include assets on which the Prepetition Secured Lenders claim to have liens. The Debtors will need this cash to satisfy payroll, pay suppliers, meet overhead, pay expenses, and make any other payments that are essential for the continued management and preservation of the Debtors' business.

---

[5]     The Debtors acknowledge the reality of the situation, however, that absent confirmation of a chapter 11 plan before the cash is gone, they may have to seek postpetition financing or convert their cases to chapter 7.

4849-7016-9548

110.    Access to existing Cash Collateral on an interim basis will provide the Debtors with the liquidity necessary to continue to operate their businesses and thus preserve and maintain the going concern value of their estates, thereby facilitating a successful chapter 11 sale process or other value-maximizing transaction. Without access to such liquidity, the Debtors' ability to navigate through chapter 11 would be jeopardized, to the detriment of the Prepetition Secured Lenders and all of the Debtors' other stakeholders.

111.    Accordingly, based on the foregoing, I respectfully submit that the Court should approve immediate access to the cash collateral and grant the Cash Collateral Motion on an interim and final basis.

### B.    Employee Wages and Benefits Motion[6]

112.    As set forth in the Employee Wages and Benefits Motion the Debtors seek authority to pay the aggregate prepetition Workforce Obligations and to continue the Workforce Programs and modify them as necessary in the ordinary course of business.

113.    As of the Petition Date, I estimate that the prepetition accrued but unpaid Workforce Obligations, which will come due during the first 21 days of these cases, are set forth in the table below and the Debtors are seeking authority to pay these amounts:

| Workforce Programs | Interim Amount | Final Amounts |
|---|---|---|
| **Compensation and Withholding Obligations** | | |
| Wages | $240,000 | $240,000 |
| Employer Payroll Taxes[7] | $15,000 | $15,000 |
| Deductions | $27,000 | $27,000 |
| Consultants | $162,000 | $162,000 |
| Vacation Days, Holidays, and Personal Days | $29,000 | $665,000 |
| Bonus Programs | $0 | $0 |

---

[6]    Capitalized terms in this section that are not defined in this Declaration, shall have the same meaning as in the Employee Wages and Benefits Motion.

4849-7016-9548

| Reimbursements | | |
|---|---|---|
| Business Expenses | $0 | $0 |
| Cell Phone Reimbursement | $300 | $300 |
| Credit Card | $100 | $100 |
| Vehicle Program | $200 | $200 |
| **Employee Benefits** | | |
| Medical Insurance[8] | $200,000 | $200,000 |
| FSA/DCA | $0 | $0 |
| Dental Insurance | $0 | $0 |
| Vision Insurance | $0 | $0 |
| Telemedicine | $0 | $0 |
| Wellness Program | $500 | $500 |
| Life and AD&D, and Disability Benefits[9] | $0 | $0 |
| Supplemental Insurance | $200 | $200 |
| 401(k) Plans | $12,000 | $12,000 |
| Defined Benefit Pension Plans | $0 | $0 |
| HRA | $500 | $500 |
| Separation Benefits | $100,000 | $100,000 |
| Employee Assistance Program | $0 | $0 |
| Workers Compensation and Black Lung | $5,200 | $5,200 |
| **Total** | **$792,000** | **$1,428,000** |

114.     If the Debtors fail to pay the Workforce Obligations due under the Workforce Programs in the ordinary course, their Workforce will suffer extreme personal hardship. The Debtors' mining operations are primarily located in rural areas and, in some cases, members of the Debtors' Workforce may be unable to pay their basic living expenses if the Debtors are not permitted to pay the prepetition Workforce Obligations in the ordinary course. Such a result would have a highly negative impact on workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and the constituents in these chapter 11 cases.

---

[8] Includes dental and vision insurance provided for Decker Employees and Administration and Stop Loss Fees for Decker Employees.

[9] Includes supplemental insurance provided for Decker Employees.

4849-7016-9548

115.    The Debtors have already streamlined their Workforce through prior layoffs and furloughs and believe the current Workforce is the minimum necessary to continue current operations without interruption.

116.    Continuing the Workforce Programs is vital to preserving and rebuilding Workforce morale during the pendency of these chapter 11 cases and to reducing the level of attrition that might otherwise occur.

117.    The relief sought in the Employee Wages and Benefits Motion is reasonably and necessary to maximize the Debtors' estates.

### C.      Utilities Motion[10]

118.    The Utilities Services List attached as Exhibit C to the Utilities Motion is a true and correct copy of the list of the Utility Companies and their affiliates that provide utility services to the Debtors' various locations and their business operations as of the Petition Date.

119.    The Debtors' business involves the production and sale of coal. Due to the nature of the business, the Debtors must maintain near constant production or risk losing customers due to missed production targets. The Utility Services are essential for the Debtors to maintain their business. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, potentially endangering the Debtors' employees' health and safety, and impacting the Debtors' ability to provide supply to their customers, which in turn could jeopardize the Debtors' ability to manage their reorganization efforts.

120.    The Debtors pay approximately $260,000.00 each month for Utility Services, calculated as a historical average payment for the twelve-month period ending July 31, 2020.

---

[10]     Capitalized terms in this section that are not defined in this Declaration, shall have the same meaning as in the Utilities Motion.

Accordingly, the Debtors estimate that the cost for Utility Services during the next 30 days (not including any deposits to be paid or any unpaid prepetition amount that has already been invoiced) will be approximately $260,000.00. Additionally, the Debtors have provided certain Utility Companies with cash deposits as set forth in the Utilities Services List.

121.    The majority of this utility expense is owed to Powder River Energy Corporation, which provides electric utility services for the Decker Mine. Prior to the Petition Date, the Debtors provided Powder River Energy Corporation with adequate assurance of payment through a cash Prepetition Deposit of $329,965.00, which reflects nearly two months of electric services.

122.    The Debtors intend to pay postpetition obligations owed to the Utility Companies in a timely manner through cash generated from operations. Cash held by the Debtors, cash generated in the ordinary course of business will provide sufficient liquidity to pay the Debtors' Utility Service obligations in accordance with prepetition practice.

123.    As additional adequate assurance, the Debtors have provided the Prepetition Deposit Powder River Energy Corporation and, for the remaining Utility Companies, the Debtors propose the Adequate Assurance Deposit of $25,426 into a segregated account at Bank of America. This represents an amount equal to approximately one-half of the Debtors' average monthly cost of those Utility Services, calculated based on the Debtors' average utility expenses over the twelve months ending July 31, 2020, as detailed in Exhibit C to the Utilities Motion.

124.    The Adequate Assurance Deposit will be held in the segregated Adequate Assurance Account at Bank of America for the benefit of the Utility Companies for the duration of these chapter 11 cases, subject to the Debtors' right to terminate or discontinue the applicable

Utilities Services, and may be applied to any postpetition defaults in payment to the applicable Utility Companies.

125.    The Debtors will hold the Adequate Assurance Deposit, and no liens will encumber the Adequate Assurance Deposit or the Adequate Assurance Account.

126.    The Debtors submit that the Adequate Assurance Deposit, the Debtors' ability to pay for future utility services in accordance with prepetition practice, and the Prepetition Deposits currently held by certain of the Utility Companies constitute sufficient adequate assurance to the Utility Companies in full satisfaction of section 366 of the Bankruptcy Code.

### D.    Tax Motion[11]

127.    The Debtors collect, withhold, and incur production and severance taxes, coal excise taxes, franchise taxes, sales and use taxes, withholding taxes, income taxes, and property taxes, as well as other business, environmental, and regulatory fees and assessments.

128.    The Authorities listed in the schedule attached as Exhibit C to the Tax Motion is a true and accurate list of the Authorities to which the Debtors remit the Taxes and Fees.

129.    Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions. The Debtors request authority to pay approximately $659,590 in such Taxes and Fees. All of this amount will be due within the first 21 days after the Petition Date.

130.    The Debtors pay the Taxes and Fees to the Authorities on a periodic basis, remitting them monthly, semi-monthly, quarterly, semi-annually, or annually depending on the nature and incurrence of a particular Tax or Fee. The Debtors seek authority pursuant to this motion to pay certain (a) Taxes and Fees where Taxes and Fees accrued or were incurred

---

[11]    Capitalized terms in this section that are not defined in this Declaration, shall have the same meaning as in the Tax Motion.

4849-7016-9548

prepetition but were not paid prepetition or were paid in an amount less than actually owed; or (b) Taxes and Fees incurred for prepetition periods may become due after the commencement of these chapter 11 cases.

131.    In addition, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.

132.    The Taxes and Fees are summarized as follows:

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due During Interim Period |
|---|---|---|---|
| **Sales & Use Tax** | Taxes imposed on the sale and use of certain goods and services, including the sale of coal. | $ 5,000 | $ 5,000 |
| **Franchise Taxes** | Taxes incurred to remain in good standing pursuant to state and local law. | $ 30,000 | $ 30,000 |
| **Property Taxes** | Taxes and obligations related to real and personal property holdings. | $ 624,590 | $ 624,590 |
| **Total** | | **$ 659,590** | **$ 659,590** |

133.    I believe that any failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations as set forth in the Tax Motion. Moreover, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, as well as statutory liens that could impact the Debtors' operations and these chapter 11 cases.

134.    Accordingly, the relief sought in the Tax Motion is necessary and is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

### E.   Cash Management Motion[12]

135.   The Debtors maintain the Cash Management System, which is necessary to carry out the financial obligations of the fifteen Debtors, including the Debtors' various operations described in this Declaration.

136.   The Debtors' operating, payroll, and savings accounts are held at the Cash Management Banks—Bank of America and JP Morgan Chase. Additionally, the Debtors have a trust account with the Bank of New York Mellon that serves solely as collateral pursuant to the Debtors' surety bonds.

   a.   ***Operating Accounts.*** Nine of the Bank Accounts are separate Operating Accounts for Lighthouse, KCP, LH Products, Decker Coal, and MBTL. KCP has one operating account at Bank of America, while Lighthouse, LH Products, Decker Coal, and MBTL each have two operating accounts – one at JP Morgan Chase and one at Bank of America. One or more of the Operating Accounts may become inactive due to as the Debtors complete their transition from JP Morgan Chase to Bank of America for their operating accounts.

   b.   The Debtors' primary source of revenue is from the sale of coal, including the receipt of management fees from the Black Butte Project. Cash generated from operations generally flows into the Cash Management System by way of check, wire transfer, or electronic funds transfers into one of the Debtors' Operating Accounts. Funds in the Operating Accounts are used on an as-needed basis to pay operating expenses, including to vendors, utilities, insurance premiums, royalty obligations, and employee wage and benefit obligations.

---

[12]   Capitalized terms in this section that are not defined in this Declaration, shall have the same meaning as in the Cash Management Motion.

4849-7016-9548

c.      ***Payroll Accounts.*** Five of the Bank Accounts are separate Payroll

Accounts for Lighthouse, Decker Coal, and MBTL. Two of the Payroll Accounts may

become inactive as the Debtors complete their transition from using JP Morgan Chase to

Bank of America for its Payroll Accounts. Each pay period, these Debtors fund their

respective Payroll Accounts from their respective Operating Accounts. For Lighthouse

and MBTL, payroll is funded from the Operating Account to the Payroll Account on a bi-

monthly basis. For Decker Coal, payroll is funded from the Operating Account to the

Payroll Account on a weekly basis. The Debtors utilize a third-party administrator,

Paylogics, to process employee payroll. As payroll administrator, Paylogics automatically

draws amounts from the appropriate Payroll Account to fund payroll disbursements.

d.      ***Interest Bearing Accounts.*** Four of the Debtors' Bank Accounts are

interest-bearing savings accounts. Two such accounts are held by Lighthouse, and two

are held by MBTL. The Interest-Bearing Accounts each hold small balances, except that

one Interest-Bearing Account of MBTL holds $50,000 to secure repayment of a JP

Morgan Chase credit card.

137.    Debtors use the Cash Management Banks because they are trustworthy, well

capitalized institutions with a strong reputation in the Debtors' home market. Moreover, the Cash

Management Banks do not charge the Debtors any fees for its cash management services, which

provides the Debtors and their creditors substantial benefits. The Debtors believe they can

maintain the Bank Accounts at the Cash Management Banks without jeopardizing any parties in

interest and that any funds deposited in any of the Bank Accounts are secure. Requiring the

Debtors to transfer their Cash Management System or for the Cash Management Banks to post a

bond would place a needless administrative burden on the Debtors and likely impose unnecessary costs on the Debtors estates.

138.    In addition, transferring the Bank Accounts could take weeks and because some are subject to automatic draws, including, but not limited to, the Payroll via Paylogics. Thus, it would not be logically possible to transfer the Bank Accounts.

139.    ***Trust Account.*** Debtor LHR Coal, formerly known as AE Coal, LLC, holds a trust account with the Bank of New York Mellon that contains $39,718,740 in restricted cash for the benefit of Zurich, which serves as collateral with respect to Surety Bonds from Zurich. The Trust Assets deposited in the Trust Account are governed by a Collateral Trust Agreement dated November 10, 2011 by and between Zurich (as Beneficiary), AE Coal, LLC (as Grantor, which is now LHR Coal), and The Bank of New York Mellon (as Trustee), as amended. Pursuant to the Collateral Trust Agreement, only Zurich, as Beneficiary, is authorized to withdraw or transfer Trust Assets from the Trust Account—the Debtors are strictly prohibited from withdrawing or transferring the Trust Assets from the Trust Account.

140.    Thus, the Debtors are prohibited from transferring the Trust Account funds and requiring the Debtors to move these funds from the Bank of New York Mellon to another bank would place a difficult and perhaps impossible burden on the Debtors.

141.    Finally, the Debtors' Cash Management System also allows for necessary Intercompany Transactions, as detailed in the Cash Management Motion. They occur in the ordinary course and are consistent with historical practice. If discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' and each of their estates' detriment.

142.    In the Interim Period, the Debtors anticipate making $2.7 million in Intercompany Transactions from Lighthouse to the Lighthouse Subsidiaries to fund operations.

143.    Accordingly, the relief sought in the Cash Management Motion is reasonable and necessary and will be in the best interest of the Debtors' creditors as it will allow the Debtors to continue to operate without significant disruption.

F.    **Critical Vendor Motion[13]**

144.    Prior to the Petition Date, I, with the assistance of the Debtors' other officers, operational employees, and advisors, engaged in a process to (a) identify those trade vendors, suppliers, and service providers that are most critical to the Debtors' business and (b) estimate the aggregate amounts owed to such vendors as of the Petition Date.

145.    We considered a variety of factors, including, among other things:

- whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal or better terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales of future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or to provide critical services on a postpetition basis;

---

[13]    Capitalized terms in this section that are not defined in this Declaration, shall have the same meaning as in the Critical Vendor Motion.

4849-7016-9548

- whether failure to pay all or part of a particular vendor's claim would significantly harm such vendor's ability to remain in business, leading to fewer options in the market for the Debtors to choose from;

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation; and

- whether authorization for payment of a particular vendor is being sought under another motion of the Debtors for first day relief.

146.    Following this analysis, we identified certain critical vendors utilized in the ordinary course that would be difficult or impossible to replace or could only be replaced at substantially higher costs for the Debtors as they transition into chapter 11. Due to the type of relief the Critical Vendor Motion seeks and the Debtors' limited budget, we took this process very seriously and identified only those Critical Vendors that the Debtors could not operate without; they are accurately listed on Exhibit C to the Critical Vendor Motion.

147.    As of the Petition Date, the Debtors believe that Critical Vendors hold claims totaling approximately $350,000 in prepetition Critical Vendor Claims that are not entitled to administrative or other priority status under section 503(b)(9) of the Bankruptcy Code, approximately $150,000 of which may become due and payable within the first 21 days after the Petition Date.

148.    Thus, I believe the Debtors need authority to pay up to $150,000 to Critical Vendors on an interim basis, and up to a maximum of $350,000 on a final basis to be able to continue operations without interruption.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief

Executed on December 3, 2020

/s/ Darin T. Adlard
Darin Adlard, CPA
Vice President of Finance and Accounting
Lighthouse Resources Inc.

4849-7016-9548

## **Exhibit 1**

## **Debtors' Organizational Chart**

# 2020 Organizational Structure



**<u>Exhibit 2</u>**

**John T. Boyd 2020 U.S. Third Quarter Update**

**Table 1:  U.S. Quarterly Coal Production (000 tons)**
**2020 Third-Quarter (Preliminary) Update**
Prepared by John T. Boyd Company - November 2020



| Mining | 2019 | | | | 2020 | | | Tons 2020 Q3 vs | | Operating Mines | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Type | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 (Prelim) | 2020 Q2 | 2019 Q3 | 2019 Q3 | 2020 Q3 |
| **NAPP** | | | | | | | | | | | |
| Pitt8 LW | 21,205 | 22,217 | 18,451 | 19,633 | 16,012 | 10,911 | 14,610 | 33.9% | -20.8% | 11 | 11 |
| Other LW | 1,356 | 1,702 | 1,805 | 1,487 | 1,507 | 1,593 | 1,444 | -9.4% | -20.0% | 2 | 2 |
| Other UG | 2,370 | 2,860 | 2,459 | 2,266 | 2,296 | 1,853 | 2,138 | 15.4% | -13.0% | 30 | 28 |
| Surface | 1,349 | 1,433 | 1,361 | 1,348 | 1,154 | 774 | 882 | 13.9% | -35.2% | 77 | 59 |
| | 26,280 | 28,212 | 24,075 | 24,734 | 20,969 | 15,131 | 19,073 | 26.1% | -20.8% | 120 | 100 |
| **CAPP** | | | | | | | | | | | |
| LW | 2,029 | 1,995 | 1,972 | 1,473 | 1,871 | 936 | 1,036 | 10.7% | -47.5% | 3 | 3 |
| Other UG | 8,874 | 8,619 | 7,891 | 7,465 | 7,936 | 5,532 | 5,823 | 5.3% | -26.2% | 108 | 74 |
| Surface | 8,045 | 9,235 | 8,921 | 6,941 | 5,291 | 4,074 | 4,377 | 7.4% | -50.9% | 147 | 97 |
| | 18,948 | 19,849 | 18,784 | 15,878 | 15,097 | 10,541 | 11,236 | 6.6% | -40.2% | 258 | 174 |
| **SAPP** | | | | | | | | | | | |
| LW | 3,257 | 3,327 | 2,779 | 2,340 | 2,693 | 2,841 | 2,431 | -14.4% | -12.5% | 4 | 4 |
| Other UG | 70 | 87 | 72 | 48 | 55 | 32 | 31 | -1.6% | -56.7% | 2 | 1 |
| Surface | 507 | 516 | 562 | 597 | 489 | 359 | 397 | 10.6% | -29.5% | 16 | 16 |
| | 3,834 | 3,930 | 3,414 | 2,985 | 3,237 | 3,232 | 2,859 | -11.5% | -16.3% | 22 | 21 |
| **ILB** | | | | | | | | | | | |
| LW | 7,425 | 6,243 | 6,121 | 4,259 | 4,432 | 3,287 | 4,102 | 24.8% | -33.0% | 4 | 4 |
| Other UG | 15,719 | 14,820 | 13,657 | 12,461 | 11,144 | 7,709 | 9,572 | 24.2% | -29.9% | 18 | 12 |
| Surface | 4,894 | 4,810 | 4,754 | 4,184 | 3,935 | 3,280 | 3,307 | 0.8% | -30.4% | 19 | 15 |
| | 28,037 | 25,872 | 24,533 | 20,905 | 19,511 | 14,276 | 16,982 | 19.0% | -30.8% | 41 | 31 |
| **PRB** | 70,415 | 71,439 | 79,983 | 72,336 | 62,637 | 49,197 | 59,902 | 21.8% | -25.1% | 16 | 16 |
| **West** | | | | | | | | | | | |
| LW | 8,763 | 9,090 | 8,553 | 7,661 | 7,570 | 6,298 | 6,644 | 5.5% | -22.3% | 10 | 9 |
| Other UG | 553 | 614 | 582 | 654 | 573 | 457 | 384 | -15.9% | -34.0% | 4 | 3 |
| Surface | 7,719 | 7,818 | 6,302 | 5,940 | 5,689 | 4,583 | 5,254 | 14.6% | -16.6% | 14 | 11 |
| | 17,035 | 17,522 | 15,437 | 14,255 | 13,832 | 11,338 | 12,282 | 8.3% | -20.4% | 28 | 23 |
| **Gulf Lignite** | 7,275 | 6,261 | 7,605 | 6,272 | 6,006 | 4,854 | 6,137 | 26.4% | -19.3% | 10 | 8 |
| **Dakota Lignite** | 7,200 | 5,958 | 6,842 | 6,996 | 7,186 | 6,195 | 6,657 | 7.5% | -2.7% | 5 | 5 |
| **Anthracite** | 566 | 699 | 652 | 799 | 693 | 468 | 643 | 37.3% | -1.4% | 43 | 36 |
| **US Total** | | | | | | | | | | | |
| LW | 44,035 | 44,575 | 39,681 | 36,852 | 34,084 | 25,867 | 30,266 | 17.0% | -23.7% | 34 | 33 |
| Other UG | 27,586 | 26,999 | 24,661 | 22,894 | 22,004 | 15,582 | 17,950 | 15.2% | -27.2% | 162 | 118 |
| Surface | 107,969 | 108,168 | 116,983 | 105,413 | 93,079 | 73,785 | 87,556 | 18.7% | -25.2% | 347 | 263 |
| Total - US | 179,590 | 179,742 | 181,325 | 165,160 | 149,168 | 115,234 | 135,771 | 17.8% | -25.1% | 543 | 414 |

Source: MSHA 7000-2 (Third Quarter 2020 Preliminary), Numbers mat not add due to rounding.

**Exhibit 3**

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO A CHAPTER 11 PLAN OF REORGANIZATION. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR, AS APPLICABLE, PROVISIONS OF THE BANKRUPTCY CODE.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (with the exhibits attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of December 2, 2020, is entered into by and among: (i) Lighthouse Resources, Inc., a Delaware corporation ("**LRI**"), and each of the undersigned subsidiaries of LRI (the "**Subsidiaries**" and, together with LRI the "**Debtors**"); (ii) Resource Capital Fund V L.P., a Cayman Islands exempt limited partnership ("**RCF V**"), Resource Capital Fund VI L.P., a Cayman Islands exempt limited partnership ("**RCF VI**"), and RCF V Annex Fund L.P., a Cayman Islands exempt limited partnership ("**RCF Annex**" and, together with RCF V and RCF VI, the "**Prepetition Secured Lenders**"); (iii) Zurich American Insurance Company, an Illinois corporation ("**Zurich**"); (iv) Atlantic Specialty Insurance Company, a New York ("**Atlantic**"); and (v) Westchester Fire Insurance Company, a Pennsylvania corporation ("**Westchester**" and, together with Zurich and Atlantic, the "**Sureties**"). Debtors, the Prepetition Secured Lenders, the Sureties and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are each referred to herein as a "**Party**" and collectively referred to herein as the "**Parties**."

### Recitals

A.      Debtors are in the business of mining and selling coal and own, among other assets, the Decker Coal Mine, located in the northwestern section of the Powder River Basin in Big Horn County, Montana, adjacent to the border of Wyoming (the "**Decker Mine**"), and a 50% interest in Black Butte Coal Company, a joint venture ("**Black Butte JV**") that owns and operates an open cut (surface) mine in the Green River Basin, located in Sweetwater County, Wyoming (the "**Black Butte Mine**"). Debtors' coal-related assets are held by debtor LHR Coal LLC ("**LHR Coal**") and its debtor subsidiaries KCP, Inc., Big Horn Coal Company, Rosebud Coal Sales Company, KCP Properties, Inc., Decker Holding Co., LLC, Decker Coal Company, LLC, and Montana Royalty Holdings, LLC  (together, the "**LHR Coal Subsidiaries**").

B.      LRI owns a 100% interest in debtor LHR Infrastructure, LLC ("**LHR Infrastructure**"). LHR Infrastructure is in the business of developing an export facility on the Columbia River in the State of Washington.

C.      LRI and the Subsidiaries entered into multiple loan agreements (the "**Loan Documents**") with RCF VI as agent and lender and RCF V and RCF Annex as lenders, which loans are secured by a first-priority lien on substantially all of the Debtors' assets.

D.      The Sureties have issued various bonds (the "**Bonds**") for the benefit of the State of Montana and the State of Wyoming to secure reclamation of the Decker Mine and the Black

Butte Mine, respectively, and each of the Debtors, as well as other third-parties, are indemnitors under such bonds pursuant to certain indemnity agreements (the "**Indemnity Agreements**").

E.    The Parties have engaged and continue to engage in good faith, arm's-length negotiations to enter into certain restructuring transactions (the "**Restructuring**") in accordance with the terms and conditions set forth in this Agreement and to be implemented pursuant to a chapter 11 plan of reorganization for Debtors, as debtor and debtor in possession, in form and substance reasonably satisfactory to the Consenting Stakeholders (as defined below) (the "**Plan**") under title 11 of the United States Code (the "**Bankruptcy Code**"), pursuant to which LHR Coal and the LHR Coal Subsidiaries shall be reorganized (respectively, as reorganized, "**Reorganized LHR Coal**" and the "**Reorganized LHR Coal Subsidiaries**") for the purpose of winding down the business of LHR Coal and the LHR Coal Subsidiaries, reclaiming the Decker Mine in accordance with a reclamation plan agreed to by all Parties and for which all applicable regulatory and/or third-party approvals have been obtained (including, without limitation, any approval of the State of Montana) ("**Reclamation Plan**"), and performing the reclamation obligations at the Black Butte Mine associated with the ownership interest in the Black Butte JV.

F.    The Restructuring shall include:

(i).    the preparation of the Plan under the Bankruptcy Code, and a disclosure statement containing "adequate information" (as that term is used in the Bankruptcy Code) with respect to the Plan (the "**Disclosure Statement**"); and

(ii).    the Debtors' use of the cash collateral of the Prepetition Secured Lenders in accordance with interim and final orders of the Bankruptcy Court (as defined below) authorizing the Debtors' use of cash collateral in accordance with an approved budget, in substantially the form of the interim order as is attached hereto as <u>Exhibit A</u> (the "**Interim Cash Collateral Order**") and a final order in form and substance acceptable to the Prepetition Secured Lenders and reasonably acceptable to the Sureties (the "**Final Cash Collateral Order**");

G.    In connection with the Restructuring, the Parties agree that the following documents shall form the initial basis for the good faith negotiations of the Parties with respect to the terms, conditions, provisions and implementation of the Plan and other Definitive Documents:

(i).    the term sheet attached hereto as <u>Exhibit B</u> (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, including any exhibits or schedules attached thereto (the "**Reclamation Funding Term Sheet**")), with respect to the funding of the implementation of the Reclamation Plan, commencing on the occurrence of the effective date with respect to the Plan (the "**Plan Effective Date**");

(ii).    the term sheet attached hereto as <u>Exhibit C</u> (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, including any exhibits or schedules attached thereto (the "**Trust Term Sheet**")), providing for the creation, effective as of the Plan Effective Date, of a trust (the "**Reclamation Trust**") governed by a trust agreement or other constitutional document in form and substance acceptable

to the Consenting Stakeholders (the "**Reclamation Trust Agreement**"), to hold all of the membership interests (and other equity interests) in Reorganized LHR Coal, effectuate and finance the Reclamation Plan with respect to the Decker Mine and reclamation obligations with respect to the Black Butte Mine, hold and administer the Sinking Fund, and to distribute assets to certain creditors; and

(iii).    liquidation by the Debtors of the assets of LRI Infrastructure during the pendency of the Chapter 11 Cases (as defined below) or through a liquidating trust to be created effective as of the Plan Effective Date.

H.    The Restructuring shall be implemented through the commencement by Debtors of a voluntary case under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), confirmation and consummation of the Plan, and the negotiation of Definitive Documents mutually agreeable to the appropriate Parties for the transactions described in the Reclamation Funding Term Sheet, and the Trust Term Sheet (together, the "**Term Sheets**").

I.    As of the date hereof, the Prepetition Secured Lenders hold, in the aggregate, secured claims, including any unsecured deficiency, against Debtors of not less than $256,023,552.89 arising on account of the Loan Documents (the "**Prepetition Secured Lender Claims**").  The Prepetition Secured Lenders have agreed, subject to receipt of the Solicitation Materials and the successful negotiation and execution of Definitive Documents acceptable to the Prepetition Secured Lenders, to support the Plan and timely vote or cause to be voted all of the Prepetition Secured Lender Claims to accept the Plan in accordance with this Agreement.

J.    As of the date hereof, the Sureties hold claims against the Debtors arising from, among other things, the Indemnity Agreements (the "**Surety Claims**").  The Sureties have agreed, subject to receipt of the Solicitation Materials and the successful negotiation and execution of the Plan and Definitive Documents acceptable to the Sureties, to support the Plan and timely vote or cause to be voted all of the Surety Claims to accept the Plan in accordance with this Agreement.

**NOW, THEREFORE**, in consideration of the promises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, covenant and agree as follows:

1.    Certain Definitions. As used in this Agreement, the following terms have the following meanings:

"**Bonding Agreements**" shall mean (a) the assumption and assignment of the existing Indemnity Agreements, and (b) an indemnity agreement and other agreements pursuant to which the Reclamation Trust, Reorganized LHR Coal and Reorganized LHR Coal Subsidiaries each agree, on a joint and several basis, to indemnify the Sureties under the Bonds, which, among other things, will provide that such agreements will not impact, modify or otherwise alter the Sureties' rights under the existing Indemnity Agreements, which rights shall be preserved, unimpaired, and unmodified; provided, however, the Sureties agree that they will not pursue any

such rights under the Indemnity Agreements against Black Butte unless and until there is an anticipatory default or a default under the Plan or other Definitive Document.

"**Cash Collateral Orders**" means, together, the Interim Cash Collateral Order and Final Cash Collateral Order.

"**Confirmation Order**" means the confirmation order with respect to the Plan, which shall be consistent with this Agreement.

"**Consenting Stakeholders**" means, collectively, the Prepetition Secured Lenders and the Sureties.

"**Consenting Stakeholder Claims**" means, collectively, the Prepetition Secured Lender Claims and the Surety Claims.

"**Definitive Documents**" means the documents listed in Section 3, including any related agreements, instruments, schedules, or exhibits, that are necessary or desirable to implement, or otherwise relate to, the Restructuring.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials.

"**First Day Pleadings**" means the first-day pleadings that the Debtors file contemporaneously with the commencement of the Chapter 11 Cases.

"**New Organizational Documents**" means the operating agreements or other constitutional documents for Reorganized LHR Coal and its reorganized subsidiaries.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court which shall include, without limitation (i) schedules of assumed or rejected contracts, (ii) the New Organizational Documents; (iii) the Reclamation Trust Agreement; and (iv) the Bonding Agreements.

"**Sinking Fund**" is as defined in the Reclamation Funding Term Sheet.

"**Sinking Fund Agreement**" means the agreement governing the administration of the Sinking Fund.

"**Solicitation**" means the solicitation of votes to accept or reject the Plan pursuant to the Bankruptcy Code.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan, including the Disclosure Statement and related ballots.

"**Support Effective Date**" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) Debtors, (ii) the Prepetition Secured Lenders, and (iii) the Sureties.

4827-3762-0179.v5

2.      _Term Sheets_.  The Term Sheets are non-binding on any Party, and as set forth therein, the Term Sheets merely form the basis for the negotiation of the Definitive Documents. Each Party acknowledges and agrees that, subject to the Parties' negotiations, the terms and conditions set forth in the Definitive Documents may differ in material respects from the Term Sheets.  No Party hereto shall be bound, obligated or liable hereunder or thereunder except to the extent specifically set forth in this Agreement or otherwise agreed to by such Party in a Definitive Document that has been validly executed and delivered by such Party and all other parties signatories thereto.

3.      _Definitive Documents_.

(a)      The Definitive Documents governing the Restructuring shall include the following:

(i)      this Agreement;

(ii)      the Disclosure Statement and its exhibits, including procedures for Solicitation, and the motion seeking approval of the same;

(iii)      the Disclosure Statement Order and its exhibits, including the other Solicitation Materials;

(iv)      the Plan

(v)      the Confirmation Order and pleadings in support of its entry;

(vi)      the Plan Supplement;

(vii)      the First Day Pleadings and all orders sought pursuant thereto;

(viii)      the Cash Collateral Orders;

(ix)      the Reclamation Trust Agreement;

(x)      the Sinking Fund Agreement;

(xi)      the New Organizational Documents; and

(xii)      Bonding Agreements.

(b)      The Definitive Documents that are not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion and, except as expressly contemplated in this Agreement (including as set forth in the exhibits and annexes hereto), shall be consistent with this Agreement.

(c)      Subject to the terms hereof, each Party shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.  Each Party hereby covenants and agrees to cooperate

4827-3762-0179.v5

with each other Party in good faith in connection with, and shall exercise commercially reasonable efforts with respect to, the pursuit, approval, implementation, and consummation of the Restructuring, as well as the negotiation, drafting, execution, and delivery of the Definitive Documents; *provided* that no Party shall have any obligation to agree to any modification or term of the Definitive Documents to which it is a party or the Plan that (i) is inconsistent in any material respect with the results of the negotiations of the Parties based upon the Term Sheets, (ii) creates any new material obligation on such Party, or (iii) adversely changes or otherwise adversely affects the economic treatment of such Party (it being agreed that, for the avoidance of doubt, any modification to the Definitive Documents that results in a diminution of the value of the property to be received by any party through the Restructuring or an expansion of the potential amount of liability to which a party may be exposed (calculated net of any amount of collateral securing the payment or performance of any liability or obligation resulting from such exposure) shall be deemed to adversely affect such Party), whether such change is made directly to the treatment of such Party under the Plan or otherwise; *further, provided* that in the event that the Debtors and the Consenting Stakeholders agree on an alternative structure that provides tax efficiencies and lower costs, the Parties shall use good faith efforts to implement an alternative Reclamation Trust structure.

4.     <u>Commitments of the Consenting Stakeholders</u>.

(a)     <u>Affirmative Commitments</u>.  So long as this Agreement has not been terminated in accordance with the terms hereof, each Consenting Stakeholder agrees, severally, and not jointly, in respect of all of its Consenting Stakeholder Claims, to:

(i)     support the Restructuring and vote and exercise any powers or rights available to it with respect to any Consenting Stakeholder Claim in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring in accordance with the terms and conditions agreed to by the Parties and evidenced by the Definitive Documents;

(ii)     negotiate in good faith and use commercially reasonable efforts to negotiate, execute, and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party;

(iii)     each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms severally, and not jointly, agrees that it shall, subject to receipt by such Consenting Stakeholder of the Solicitation Materials and the Definitive Documents in form and substance satisfactory to such Consenting Stakeholder:

(A)     vote each of its Consenting Stakeholder Claims to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis; and

(B)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clause (A) above.

(b)     <u>Negative Commitments</u>.  So long as this Agreement has not been terminated in accordance with the terms hereof, each Consenting Stakeholder agrees, severally,

6

and not jointly, in respect of all of its Consenting Stakeholder Claims, that it shall not directly or indirectly:

        (i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring; <u>provided</u>, <u>however</u>, notwithstanding anything to the contrary set forth in this Agreement, any Consenting Stakeholder shall be entitled to take any action as it may deem necessary or appropriate (x) to enforce this Agreement, any Definitive Document, or any right of such Consenting Stakeholder under any of the foregoing, or (y) as otherwise permitted under this Agreement

        (ii)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement;

        (iii)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Restructuring contemplated herein against the Debtors or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

        (iv)     exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of the Consenting Stakeholder Claims against the Debtors, other than to enforce this Agreement, the Cash Collateral Orders, the Plan, the Confirmation Order, or any other Definitive Document or as otherwise permitted under this Agreement;

        (v)     object to, delay, impede, or take any other action to interfere with the Debtors' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code;

        (vi)     object to or commence any legal proceeding challenging (i) the adequate protection granted or proposed to be granted to the Prepetition Secured Lenders under the Cash Collateral Orders or (ii) entry of the Cash Collateral Orders; or

        (vii)     object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by Debtors in the Bankruptcy Court that is consistent with this Agreement.

        (c)     <u>Limitation</u>.  Notwithstanding any other provision of this Agreement to the contrary, including this Section 4, nothing in this Agreement shall require any Consenting Stakeholder to incur, assume, or become liable for any expenses, liabilities, or other obligations, or to commence litigation or agree to any commitments, undertakings, concessions, indemnities, or other arrangements to such Consenting Stakeholder that could result in expenses, liabilities, or other obligations to such Consenting Stakeholder other than as specifically and expressly required in this Agreement.

        (d)     <u>Restrictions on Transfers</u>.  Each Consenting Stakeholder agrees that it shall not directly or indirectly, in whole or in part, sell, contract to sell, give, participate, encumber, grant a security interest in, offer, sell any option or contract to purchase, transfer,

loan, issue, pledge, hypothecate, assign, or otherwise dispose of (each, a "**Transfer**"), its respective Consenting Stakeholder Claims or any option thereon or any right or interest therein or any other claims against or interests in Debtors (collectively, the "**Claims**") (including grant any proxies, deposit any Claims into a voting trust, or enter into a voting agreement with respect to any such Claims), unless the transferee thereof either (i) is a Consenting Stakeholder, or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Stakeholder and to be bound by all of the terms of this Agreement applicable to Consenting Stakeholders (including with respect to any and all Claims it already may hold against or in Debtors prior to such Transfer) by executing a joinder agreement (a "**Joinder Agreement**"), and delivering an executed copy thereof within two (2) business days following such execution, to the Parties, in which event (A) the transferee shall be deemed to be a Consenting Stakeholder, as applicable, hereunder to the extent of such transferred rights and obligations, and (B) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations, in each case for the duration of the period commencing on the date hereof and ending on the date on which this Agreement is terminated in accordance with Section 7. Each Consenting Stakeholder agrees that any Transfer of any Claims that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and Debtors and each other Consenting Stakeholder (as applicable) shall have the right to enforce the voiding of such Transfer.

(e) <u>Additional Claims</u>. Nothing herein shall be construed to restrict a Consenting Stakeholder's right to acquire Claims after signing this Agreement. Each Consenting Stakeholder agrees that if any Consenting Stakeholder acquires additional Claims, then (i) such Claims shall be subject to this Agreement (including the obligations of the respective Consenting Stakeholder under this Section 4), and (ii) following such acquisition, such Consenting Stakeholder shall notify the Debtors of the amount and types of claims it has acquired (A) on no less than a monthly basis, and (B) additionally, upon the reasonable request of Debtors.

5. <u>Agreements of Debtors</u>.

(a) <u>Solicitation and Confirmation</u>. Debtors agree to:

(i) act in good faith and use commercially reasonable efforts to support and successfully complete the Solicitation in accordance with the terms of this Agreement;

(ii) support and take all steps reasonably necessary and desirable to consummate the Restructuring in accordance with this Agreement, subject to any subsequent written agreement among the parties-in-interest;

(iii) to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(iv) use best efforts to obtain any and all required regulatory and/or third-party approvals in connection with the Restructuring, including, without limitation, any approval from the State of Montana regarding the reclamation of the Decker Mine and secure

8

approval by the State of Montana for a reduction in the penal amounts of the applicable surety bonds in consideration of the Sureties' contributions of collateral to the Trust;

(v)    negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring as contemplated by this Agreement;

(vi)    provide counsel to the Prepetition Secured Lenders and Sureties a reasonable opportunity to review draft copies of all material First Day Pleadings and all other material pleadings filed by the Company Parties in the Chapter 11 Cases; and

(vii)    do all things reasonably necessary and appropriate in furtherance of confirming the Plan and consummating the Restructuring in accordance with, and within the time frames contemplated by, this Agreement (including within the deadlines set forth in Section 6), in each case to the extent consistent with, upon the advice of counsel, the fiduciary duties of the board of directors of Debtors.

(b)    Certain Additional Chapter 11 Related Matters.

(i)    Debtors shall provide draft copies of all material motions or applications and other documents relating to the Plan, Disclosure Statement, any proposed amended version of the Plan or Disclosure Statement, and all first day pleadings that Debtors intend to file with the Bankruptcy Court to counsel for the respective Consenting Stakeholders, if reasonably practicable, at least two (2) business days prior to the date when the Debtors intend to file any such pleading or other document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.

(ii)    Debtors shall oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring.

6.    Bankruptcy Milestones.

(a)    Commencement of the Chapter 11 Cases.  Debtors shall, as soon as reasonably practicable but in no event later than December 7, 2020 (the "**Petition Date**"), file a voluntary petition with the Bankruptcy Court for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Case.

(b)    Filing of the Plan.  Debtors shall file the Plan and the Disclosure Statement with the Bankruptcy Court on or before December 15, 2020.

(c)    Definitive Documents.  The appropriate Parties shall promptly begin the negotiation of the Definitive Documents, which shall be finalized and, where possible, entered into on or before the filing of the Plan Supplement.

9

(d)    <u>Filing of the Plan Supplement</u>.  Debtors shall file the Plan Supplement no later than ten (10) days prior to the deadline to submit ballots to accept or reject the Plan.

(e)    <u>Confirmation of the Plan</u>. Debtors shall use commercially reasonable efforts to obtain confirmation of the Plan on or before March 1, 2021, in accordance with the Bankruptcy Code and on terms consistent with this Agreement.

(f)    <u>Participation in the Chapter 11 Case</u>.  Nothing in this Agreement shall limit any Party's rights to:  (i) appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Case, so long as such appearance and positions advocated in connection therewith are not inconsistent with this Agreement, or (ii) enforce any rights under this Agreement.

(g)    <u>Cooperation; Reservation of Rights</u>.  All Parties shall do all things reasonably necessary and appropriate to consummate the Restructuring in accordance with, and within the time frames set forth in, this Agreement and the Definitive Documents applicable to such Party.  No Party shall take or fail to take any action in the Chapter 11 Cases or otherwise inconsistent with this Agreement or the Definitive Documents applicable to such Party.  If the transactions contemplated hereby are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

7.    <u>Termination of Agreement</u>.

(a)    <u>Automatic Termination</u>.  This Agreement shall automatically terminate (i) three (3) business days following the delivery of written notice to the other Parties from a Consenting Stakeholder at any time after the occurrence and during the continuance of any Stakeholder Termination Event (as defined below); (ii) three (3) business days following delivery of notice from Debtors to the Consenting Stakeholders at any time after the occurrence and during the continuance of any Debtor Termination Event (as defined below); (iii) without any further required action or notice upon the occurrence of the effective date of the Plan and the other Definitive Documents.

(b)    <u>Mutual Termination</u>. This Agreement and the obligations hereunder may be terminated by mutual agreement of the Parties upon the receipt of written notice delivered in accordance with Section 20.

(c)    <u>Stakeholder Termination Events</u>.  A "**Stakeholder Termination Event**" shall mean any of the following:

(i)    The breach in any material respect by Debtors of any of the undertakings, representations, warranties, or covenants of Debtors set forth herein which remains uncured for a period of two (2) business days after the receipt of written notice of such breach from the Consenting Stakeholders.

(ii)    Debtors fail to commence the Chapter 11 Cases on or before the Petition Date.

10

(iii)    Debtors fail to file a motion for entry of the Cash Collateral Orders on the Petition Date.

(iv)    The Bankruptcy Court fails to enter the Interim Cash Collateral Order on or before 3 business days after the Petition Date.

(v)    Debtors fail to file the Plan and Disclosure Statement, both in form and substance satisfactory to the Consenting Stakeholders, on or before December 15, 2020.

(vi)    The Bankruptcy Court fails to enter the Final Cash Collateral Order on or before 25 days after entry of the Interim Cash Collateral Order.

(vii)    The Bankruptcy Court fails to enter the Disclosure Statement Order in form and substance satisfactory to the Consenting Stakeholders on or before January 15, 2021.

(viii)    The Bankruptcy Court fails to enter the Confirmation Order in form and substance reasonably satisfactory to the Consenting Stakeholders on or before March 1, 2021.

(ix)    The Plan Effective Date fails to occur on or before March 7, 2021 (the "**Outside Date**").

(x)    Debtors withdraw the Plan or Disclosure Statement or file any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement or any Definitive Document and such motion or pleading has not been withdrawn prior to the earlier of (A) two (2) business days after Debtors receive written notice from the Consenting Stakeholders that such motion or pleading is inconsistent with this Agreement or any Definitive Document, and (B) entry of an order of the Bankruptcy Court approving such motion or pleading.

(xi)    Debtors file any motion, pleading, or application for approval of (A) employee benefits or compensation, pursuant to the Bankruptcy Code, (B) a key employee incentive or retention plan, and/or (C) assumption or rejection of any executory contract that is not provided for or consistent with this Agreement, or the budget approved in accordance with the Cash Collateral Orders, without the prior written consent of the Consenting Stakeholders.

(xii)    An order is entered in the Chapter 11 Cases appointing an examiner or a trustee.

(xiii)    An order is entered invalidating or disallowing, in whole or in part, the Consenting Stakeholder Claims.

(xiv)    The Bankruptcy Court grants relief that is inconsistent with this Agreement in any materially adverse respect.

(xv)    Debtors file, propound, or otherwise support any chapter 11 plan or motion that is inconsistent with this Agreement in any material respect.

11

(xvi)    The occurrence of any Event of Default under the Cash Collateral Orders.

(xvii)    Any Debtor (A) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Prepetition Secured Lender claims, liens, or interests held by any Prepetition Secured Lender arising under or relating to the Loan Documents or (B) supports any application, adversary proceeding, or cause of action referred to in the immediately preceding clause (A) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or cause of action.

(xviii)    Debtors or any of their affiliated entities sells, assigns, transfers, conveys, pledges, hypothecates, or otherwise encumbers any of their assets (A) outside the ordinary course of business or (B) in a manner inconsistent with any Definitive Document and this Agreement.

(xix)    The occurrence of the Outside Date (as defined below) or an Other Termination Event (as defined in Section 7(e)).

(xx)    Despite good faith negotiations between the Parties, the Parties fail or otherwise are unable to agree on the terms of a Definitive Document.

(xxi)    New material obligations are required of a Consenting Shareholder.

(xxii)    An event occurs that adversely changes or otherwise adversely affects the economic treatment of a Consenting Shareholder, whether such change is made directly to the treatment of such Consenting Shareholder under the Plan or otherwise.

(d)    <u>Debtor Termination Events</u>.  A "**Debtor Termination Event**" shall mean any of the following:

(i)    The breach in any material respect by one or more of the Consenting Stakeholders of any of the undertakings, representations, warranties, or covenants of such Parties set forth herein or in the Definitive Document which remains uncured for a period of two (2) business days after the receipt of written notice of such breach, but only if the breach could reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the Restructuring.

(ii)    The board of directors of Debtors reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; *provided* that the Debtors provide notice of such determination to the Consenting Stakeholders within two (2) business days after the date thereof.

(iii)    The Consenting Stakeholders no longer own at least two-thirds of their respective Consenting Stakeholder Claims.

4827-3762-0179.v5

(iv)    The occurrence of the Outside Date or an Other Termination Event.

(e)    Other Termination Events.  An "**Other Termination Event**" shall mean the following:

(i)    The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Restructuring, which ruling, judgment, or order has not been stayed, reversed, or vacated within twenty (20) business days after such issuance.

(ii)    The entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or dismissing the Chapter 11 Cases (unless caused by a default by any Consenting Stakeholder of its obligations hereunder, in which event the Consenting Stakeholder shall not have the right to terminate under this clause (ii)).

(iii)    The entry of an order by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan (unless caused by a default by any Consenting Stakeholder of its obligations hereunder, in which event the Consenting Stakeholder shall not have the right to terminate under this clause (iii)) or denying approval of the Disclosure Statement; *provided* that neither Debtors nor the Consenting Stakeholders shall have the right to terminate this Agreement pursuant to this clause (e)(iii) if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of the Plan subject only to modifications to the Plan or Disclosure Statement that would not have a material adverse effect on the Restructuring, including the recovery or treatment that the Consenting Stakeholders would receive as compared to the recovery they would have otherwise received pursuant to the Plan.

(iv)    On December 2, 2020, at 1:00 p.m. (EST), if the Support Effective Date shall not have occurred.

Notwithstanding the foregoing, any of the dates set forth in this Section 7 may be extended by agreement among the Debtors and the Consenting Stakeholders.

(f)    Effect of Termination.

(i)    Subject to the provisions contained in Section 13, upon the termination of this Agreement in accordance with this Section 7, this Agreement shall become void and of no further force or effect and each Party shall, except as otherwise provided in this Agreement, be immediately released from its respective liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement, shall have no further rights, benefits, or privileges hereunder, and, subject to the provisions of Section 7(h), shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, and no such rights or remedies shall be deemed waived pursuant to a claim of laches or estoppel; *provided*, that in no event shall any such termination relieve a Party

13

from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

(ii)     Upon the termination of this Agreement prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by a Consenting Stakeholder pursuant to this Agreement prior to the termination of this Agreement may be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise upon written notice of such Consenting Stakeholder to each other Party to this Agreement or, if the termination of this Agreement occurs on or after the Petition Date, upon such Consenting Stakeholder filing a notice with the Bankruptcy Court.

(g)     <u>Automatic Stay</u>. Debtors acknowledge that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code; *provided* that nothing herein shall prejudice any Party's rights to argue that the giving of notice of termination was not proper under the terms of this Agreement.

(h)     <u>Limitation on Damages</u>.  Under no circumstances, so long as it has acted in good faith, shall any Party have any liability of any kind to any other Party or any third party, for damages (including consequential or punitive damages, lost profits or lost opportunity costs) or otherwise, with respect to its election not to enter into Definitive Documents. Nothing herein shall modify, impact or otherwise alter the Sureties' rights under the existing Indemnity Agreements.

8.     <u>Representations, Warranties, and Covenants</u>.

(a)     Each Party represents, warrants, and covenants as to itself only, severally (and not jointly), to each other Party that the following statements are true, correct, and complete as of the date hereof (or as of the date a Consenting Stakeholder becomes a party hereto):

(i)     Such Party is a legal entity duly formed or organized (as applicable) validly existing and in good standing under the laws of the state of its incorporation or organization (as applicable), and has all requisite corporate, partnership, limited liability company, or similar power and authority to execute and deliver this Agreement and consummate the transactions contemplated hereby and perform its obligations contemplated hereunder.  The execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership, or other similar action on its part, and no other actions on the part of the Party (or its governing body, board of managers, board of directors, members, partners, stockholders, or trustees, as applicable) are necessary to authorize or adopt this Agreement or consummate the transactions contemplated hereby.

(ii)     This Agreement has been duly executed and delivered by such Party and constitutes a legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency,

reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(iii)     The execution, delivery, and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state, or governmental authority or regulatory body, except such filings as may be necessary or required by the Securities and Exchange Commission.

(iv)     The execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule, or regulation applicable to it or its articles or certificate of formation, incorporation, or organization, operating agreement, or bylaws (or other similar governing documents), each as currently in effect, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party, except, in the case of the Debtors, for the commencement of the Chapter 11 Cases.

(b)     Each Consenting Stakeholder severally (and not jointly) represents and warrants to Debtors that, as of the date hereof (or as of the date such Consenting Stakeholder becomes a party hereto), such Consenting Stakeholder (i) is the owner of its respective Consenting Stakeholder Claims and/or (ii) has, with respect to the beneficial owner(s) of such Consenting Stakeholder Claims, (A) sole investment or voting discretion with respect to such Notes, (B) full power and authority to vote on and consent to matters concerning such claims, or to exchange, assign, and Transfer such claims, and (C) full power and authority to bind or act on the behalf of, such beneficial owner(s).

9.     <u>Amendments and Waivers</u>. Except as otherwise expressly set forth herein, this Agreement, including any exhibits hereto, may not be waived, modified, amended, or supplemented except in a writing signed by Debtors, the Consenting Stakeholders, and in the event of a waiver, modification, amendment, or supplement to any Definitive Documents, or to provisions of this Agreement applicable to a Term Sheet, by each Party materially affected by such waiver, modification, amendment, or supplement; *provided* that any waiver, change, modification, or amendment to this Agreement that adversely affects the economic recoveries or treatment of any Consenting Stakeholder (it being agreed that, for the avoidance of doubt, any change to this Agreement that results in (x) a diminution of the value of the property to be received by the Consenting Stakeholders under the Plan or a Consenting Stakeholder's proportionate share of the aggregate value to be distributed to all creditors under the Plan, or (y) an expansion of the potential amount of liability to which a Consenting Stakeholder may be exposed (calculated net of any amount of collateral securing the payment or performance of any liability or obligation resulting from such exposure), shall be deemed to materially adversely affect the Consenting Stakeholder, whether such change is made directly to the treatment of the Consenting Stakeholder or to the treatment of another class or otherwise), may not be made without the written consent of each such adversely affected Consenting Stakeholder.

10.     <u>Effectiveness</u>. This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto.

4827-3762-0179.v5

11.     <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.

(a)     This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of Delaware, without giving effect to the conflict of laws principles thereof.  Each of the Parties irrevocably agrees that any legal action, suit, or proceeding (each, a "**Proceeding**") arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in any federal or state court in the State of Delaware, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Delaware courts for itself and with respect to its property, generally and unconditionally, with regard to any such Proceeding arising out of or relating to this Agreement and the Restructuring.  Each of the Parties agrees not to commence any Proceeding relating hereto or thereto except in the Delaware courts, other than Proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any Delaware court.  Each of the Parties further agrees that notice as provided in Section 22 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each of the Parties hereby irrevocably and unconditionally waives and agrees not to assert by way of motion, defense or otherwise that a Proceeding in any Delaware court is brought in an inconvenient forum or the venue of such Proceeding is improper.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all Proceedings contemplated by this Section 13(a) shall be brought in the Bankruptcy Court.

(b)     EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) IT MAKES THIS WAIVER VOLUNTARILY, AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11(b).

12.     <u>Specific Performance/Remedies</u>. Each Party hereto recognizes and acknowledges that a breach by a Party of any covenants or agreements contained in this Agreement would cause irreparable damages for which the other Parties would not have an adequate remedy at law for money damages and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which such Party is entitled at law or in equity. Each Party further agrees that it waives the defense of adequacy of a remedy at law and will not oppose the granting of an injunction or injunctions, specific performance or other equitable relief on the basis that (a) the other Party has an adequate remedy at law or (b) an award of specific performance is not an

4827-3762-0179.v5

appropriate remedy at law or in equity Each Party hereby waives any requirement for the security or posting of any bond or similar instrument in connection with such remedies.

13.     Survival. Notwithstanding the termination of this Agreement, Section 7(f), Section 7(h), and Sections 8, 11-20, and 24 shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; and any liability of a Party for failure to comply with the terms of this Agreement shall survive termination thereof.

14.     Headings.  The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

15.     Successors and Assigns; Severability.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives; *provided* that nothing contained in this Section 15 shall be deemed to permit Transfers of any Claims other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

16.     Several, Not Joint, Obligations.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint, including among the various Consenting Stakeholders.

17.     Relationship Among Parties.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.  No Party shall have any responsibility for any trading by any other entity by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.

18.     Prior Negotiations; Entire Agreement.  This Agreement, including the exhibits hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements executed between Debtors and any other Party prior to the execution of this Agreement shall continue in full force and effect.

19.     Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement delivered by facsimile or PDF shall be deemed to be an original for the purposes of this paragraph.

4827-3762-0179.v5

20.    <u>Notices</u>.   All notices hereunder shall be in writing and delivered by electronic mail, facsimile, courier, or by registered or certified mail (return receipt requested) to the following addresses and emails:

    (a)    If to Debtors, to:

        Lighthouse Resources, Inc.
        10980 South Jordan Gateway
        South Jordan, Utah 84095,
        Attn:   Robert Novak, Chief Restructuring Officer (rnovak@bdo-ba.com)

        With a copy (which shall not constitute notice) to:

        Jackson Kelly PLLC
        100 West Main Street, Suite 700
        Lexington, Kentucky  40507
        Attn:   Mary Beth Naumann (mnaumann@jacksonkelly.com)
               Charles Compton (charles.compton@jacksonkelly.com)

    (b)    If to the Prepetition Secured Lenders, to:

        Resource Capital Funds
        1400 Sixteenth Street, Suite 200
        Denver Colorado 80202
        Attn:   General Counsel

        With a copy (which shall not constitute notice) to:

        Davis Graham & Stubbs LLP
        1550 17th Street, Suite 500
        Denver, Colorado  80202
        Attn:   Joel O. Benson, Esq. (joel.benson@dgslaw.com)
               Christopher L. Richardson, Esq. (chris.richardson@dgslaw.com)
               Kyler K. Burgi, Esq. (kyler.burgi@dgslaw.com)

    (c)    If to Zurich, to:

        Zurich American Insurance Company
        600 Red Brook Blvd, Suite 600
        Owings Mills, MD 21117
        Attn:   Brian Hodges, Head of Commercial Surety
               (brian.hodges@zurichna.com)

        With a copy (which shall not constitute notice) to:

        Chiesa Shahinian & Giantomasi PC
        One Boland Drive

4827-3762-0179.v5

West Orange, New Jersey  07052
Attn:   Armen Shahinian, Esq. (ashahinian@csglaw.com)
        Scott Zuber, Esq. (szuber@csglaw.com)

(d)     If to Atlantic, to:

Atlantic Specialty Insurance Company
One State Street Plaza, 31st Floor
New York, NY 10004
Attn.:  Terry Dahl (TDahl@intactinsurance.com)

With a copy (which shall not constitute notice) to:

Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
10 S. Wacker Dr., Suite 1100
Chicago, Illinois 60606
Attn.:  John E. Sebastian (jsebastian@watttieder.com)
        Lauren E. Rankins (lrankins@watttieder.com)

(e)     If to Westchester, to:

Westchester Fire Insurance Company
150 Allen Road, Suite 101
Basking Ridge, New Jersey 07920
Attn:   Derek A. Popeil, Esq., Assistant Vice President,
        Surety Claims Manager
        (dpopeil@chubb.com)

With a copy (which shall not constitute notice) to:

Manier & Herod, PC
1201 Demonbreun St., Suite 900
Nashville, TN  37203
Attn:   Michael E. Collins (mcollins@manierherod.com)

Any notice given by delivery, mail, or courier shall be effective when received. Any notice given by facsimile or electronic mail shall be effective upon oral, machine, or electronic mail (as applicable) confirmation of transmission.

21.     Email Consents.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, or otherwise, including a written approval by the Debtors or the Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

22.     <u>Settlement Discussions</u>. This Agreement and the Term Sheets are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Proceeding other than a Proceeding to enforce its terms.

23.     <u>No Solicitation; Adequate Information</u>.  This Agreement is not and shall not be deemed to be a solicitation for votes for the acceptance of the Plan (or any other chapter 11 plan) for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or a solicitation to tender or exchange any securities.  The votes of the holders of claims against Debtors will not be solicited until such holders who are entitled to vote on the Plan have received the Plan, the Disclosure Statement and Solicitation Materials.  In addition, this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.  Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a chapter 11 plan of reorganization or an offering of securities, each Consenting Stakeholder acknowledges, agrees, and represents to the other Parties that it (a) is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act of 1933, as amended (the "**Securities Act**")), (b) understands that any securities to be acquired by it pursuant to the Restructuring have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Stakeholder's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (c) has such knowledge and experience in financial and business matters that such Consenting Stakeholder is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring and understands and is able to bear any economic risks with respect to such investment.

24.     <u>Interpretation; Rules of Construction; Representation by Counsel</u>.  When a reference is made in this Agreement to a Section or Exhibit, such reference shall be to a Section or Exhibit, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or."  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

DEBTORS:

LIGHTHOUSE RESOURCES INC.

By:_____
Name:  Everett King
Title:  President

LHR COAL, LLC

By:_____
Name:  Everett King
Title:  Manager

KCP, INC.

By:_____
Name:  Everett King
Title:  President

BIG HORN COAL COMPANY

By:_____
Name:  Everett King
Title:  President

ROSEBUD COAL SALES COMPANY

By:_____
Name:  Everett King
Title:  President

KCP PROPERTIES, INC.

By:_____

Name:  Everett King
Title:  President


DECKER HOLDING COMPANY, LLC

By:_____

Name:  Everett King
Title:  Manager


DECKER COAL COMPANY, LLC

By:_____

Name:  Everett King
Title:  Manager


MONTANA ROYALTY HOLDINGS, LLC

By:_____

Name:  Everett King
Title:  Manager


LHR INFRASTRUCTURE, LLC

By:_____

Name:  Everett King
Title: Manager


3

MILLENNIUM BULK TERMINALS-
LONGVIEW, LLC

By:_____
Name:  Everett King
Title:  Manager


BARLOW POINT LAND COMPANY, LLC


By:_____
Name:  Everett King
Title:  Manager


COLUMBIA LAND COMPANY, LLC

By:_____
Name:  Everett King
Title:  Manager


GULF STATES BULK TERMINAL, LLC


By:_____
Name:  Everett King
Title:  Manager

[SIGNATURE PAGES CONTINUE ON FOLLOWING PAGE]

**AGENT AND LENDER:**

RESOURCE CAPITAL FUND VI L.P.

By: Resource Capital Associates VI, L.P.,
    General Partner
By: RCA VI GP Ltd.,
    General Partner

By: _____
    Mason Hills
    General Counsel

**LENDERS**:

RESOURCE CAPITAL FUND V L.P.

By: Resource Capital Associates V L.P.,
    General Partner
By: RCA V GP Ltd.,
    General Partner

By: _____
    Mason Hills
    General Counsel

RCF V ANNEX FUND L.P.

By: Resource Capital Associates V L.P.,
    General Partner
By: RCA V GP Ltd.,
    General Partner

By: _____
    Mason Hills
    General Counsel

SURETIES:

ZURICH AMERICAN INSURANCE COMPANY

By: _____

Name: Michelle Randall, Esq.

Title:   Vice President – Surety Risk Solutions


ATLANTIC SPECIALTY INSURANCE
COMPANY

By: _____

Name: _____

Title: _____


WESTCHESTER FIRE INSURANCE COMPANY

By: _____

Name: Michael E. Collins

Title:   Legal Counsel

*Signature Page to Restructuring Support Agreement*

SURETIES:

ZURICH AMERICAN INSURANCE COMPANY

By:_____

Name: Michelle Randall, Esq.

Title:   Vice President – Surety Risk Solutions


ATLANTIC SPECIALTY INSURANCE COMPANY

By:_____

Name: _Terry Dahl_____

Title: _SVP_____


WESTCHESTER FIRE INSURANCE COMPANY

By:_____

Name: Michael E. Collins

Title:   Legal Counsel

SURETIES:

ZURICH AMERICAN INSURANCE COMPANY

By:_____
Name:  Michelle Randall, Esq.
Title:    Vice President – Surety Risk Solutions


ATLANTIC SPECIALTY INSURANCE
COMPANY

By:_____

Name: _____

Title: _____


WESTCHESTER FIRE INSURANCE COMPANY
By:_____
Name:  Michael E. Collins
Title:   Legal Counsel

**Exhibit A**

**Form of Interim Cash Collateral Order**

4827-3762-0179.v5

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTHOUSE RESOURCES INC. , *et al.*,[1] | ) | Case No. _____ |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## INTERIM ORDER UNDER 11 U.S.C. §§ 105, 361, 362, AND 363, BANKRUPTCY RULES 2002, 4001, AND 9014, AND LOCAL RULE 4001-2 (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, AND (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b)

This matter is before the Court pursuant to the motion filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"), on December ___, 2020 (the "Motion"), seeking, among other relief, the entry of an interim order (this "Interim Order"):

(a)    authorizing the Debtors to use Cash Collateral (as defined below) and all other Prepetition Collateral (as defined below) upon the terms consented to by Resource Capital Fund V, L.P. ("RCF V"); Resource Capital Fund VI, L.P. ("RCF VI"); and RCF V Annex Fund, L.P. ("RCF V Annex," and collectively, the "Prepetition Secured Lenders") and as set forth in the Approved Budget (as defined below) and this Interim Order;

(b)    granting adequate protection to the Prepetition Secured Lenders, as further described in the Motion and this Interim Order; and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Lighthouse Resources Inc. (4713), LHR Coal, LLC (4799), KCP, Inc. (2558), Big Horn Coal Company (7087), Rosebud Coal Sales Company (9016), KCP Properties, Inc. (8372), Decker Holding Company, LLC (8881), Decker Coal Company, LLC (3731), and Montana Royalty Holdings, LLC (1107).  The location of the Debtors' service address in these chapter 11 cases is 10980 South Jordan Gateway, South Jordan, Utah 84095.

(c)      scheduling a final hearing (the "<u>Final Hearing</u>") on the Motion pursuant to Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

The Court having held a hearing on December __, 2020 (the "<u>Interim Hearing</u>") to consider the entry of an interim order approving the Motion pursuant to Bankruptcy Rule 4001(b)(2), and having found that, under the circumstances, proper notice of the Motion and the Interim Hearing was given by the Debtors in accordance with the Bankruptcy Rules; and the Court having heard and resolved or overruled any and all objections to the interim relief requested in the Motion; and it appearing that granting the interim relief requested in the Motion is in the best interests of the Debtors, their estates (collectively, the "<u>Estates</u>") and is necessary to avoid immediate irreparable harm to the Debtors and their Estates, and their creditors; and upon the record herein and after due deliberation thereon; and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[2]

A.      <u>Petition Date</u>. On December __, 2020 (the "<u>Petition Date</u>"), the Debtors commenced the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>"). The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no trustee, examiner, or official committee of creditors holding unsecured claims (a "<u>Creditors'</u> <u>Committee</u>") has been appointed in the Chapter 11 Cases.

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable, pursuant to Bankruptcy Rule 7052.

B.      <u>Jurisdiction and Venue</u>. The Court has jurisdiction over the Chapter 11 Cases, the

parties, and the Debtors' property pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended*

*Standing Order of Reference* from the United States District Court for the District of Delaware,

dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The

Court is a proper venue for these Chapter 11 Cases and the Motion under 28 U.S.C. §§ 1408 and

1409.

C.      <u>Notice</u>. The Interim Hearing is being held pursuant to Bankruptcy Rules 2002 and

4001 and Rule 4001-2(b) of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"). Notice of the Interim

Hearing was given by the Debtors on _____, 2020 (Docket No. ___). Notice of the Motion was

provided to: (i) the Office of the United States Trustee; (ii) the Office of the United States

Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv)  the Environmental

Protection Agency and similar state environmental agencies for states in which the Debtors operate;

(v) the office of the attorneys general for the states in which the Debtors operate;  (vi) any party that

has requested notice pursuant to Bankruptcy Rule 2002; (vii) the Debtors' thirty (30) largest

unsecured creditors (on a consolidated basis); (viii) counsel to the Prepetition Secured Lenders;

(ix) counsel to the Debtors' Sureties, Zurich American Insurance Company, Atlantic Specialty

Insurance Company, and Westchester Fire Insurance Company; and (x) all other known parties

asserting a lien against any of the Debtors' assets, in each case by telecopy, email, overnight

courier, hand delivery, and/or First Class Mail. Under the circumstances, notice of the Interim

Hearing and the interim relief requested in the Motion complies with the Bankruptcy Code,

Bankruptcy Rules, and the Local Rules

D.      The Debtors require the immediate use of Cash Collateral to enable the Debtors to maximize and preserve the value of the Debtors' businesses pending the completion of certain asset sales and the consummation of a plan to accomplish an orderly liquidation, reclamation, remediation, and wind-down process, and to satisfy payroll obligations and other working capital and general corporate purposes of the Debtor and in order to avoid immediate and irreparable harm to the Debtors and their Estates.

E.      <u>Debtors' Acknowledgments and Stipulations</u>. In exchange for and as a material inducement for the Prepetition Secured Lenders to agree to the relief sought herein, the Debtors acknowledge, represent, stipulate, and agree, subject to the rights of any party other than the Debtors to assert a Challenge (as defined and set forth in paragraph 10 herein), as follows:

i.      ***The Loan Agreements.***  Prior to the Petition Date, Lighthouse Resources Inc. ("<u>Lighthouse</u>") entered into the following loan agreements with the Prepetition Secured Lenders, which are guaranteed by certain Lighthouse Subsidiaries[3]:

a.  Third Amended and Restated Loan Agreement, dated December 22, 2014, between Lighthouse (f/k/a Ambre Energy North America, Inc.) as borrower and RCF V (as amended, modified, supplemented or restated from time to time, the "<u>$55MM Loan Agreement</u>"), pursuant to which RCF V made loans to Lighthouse in the principal amount of Fifty-Five Million Dollars ($55,000,000) ("<u>$55MM Loan</u>"). All wholly owned Lighthouse Subsidiaries are guarantors of the $55MM Loan except for MBTL, Columbia, and Barlow Point.  The $55MM Loan is guaranteed and secured pursuant to certain of the RCF V Security Documents, as defined below.

b.  Loan Agreement, dated December 22, 2014, between Lighthouse (f/k/a Ambre Energy North America, Inc.) as borrower and RCF VI (as amended, modified, supplemented or restated from time to time, the "<u>$80MM Loan Agreement</u>"), pursuant to which RCF VI agreed to make loans to Lighthouse up to the principal amount of Eighty Million Dollars ($80,000,000) ("<u>$80MM Loan</u>"). All wholly owned Lighthouse Subsidiaries are guarantors of the $80MM Loan except for MBTL, Columbia, and Barlow Point.  The $80MM

---

[3] Unless stated otherwise, capitalized terms not otherwise defined in this Interim Order shall have the meanings given to them in the Motion.

Loan is guaranteed and secured pursuant to certain of the RCF VI Security Documents, as defined below.

c.    Amended and Restated Reimbursement Agreement, dated December 22, 2014, between Lighthouse (f/k/a Ambre Energy North America, Inc.) as borrower and RCF VI (as amended, modified, supplemented or restated from time to time, the "$60MM Reimbursement Agreement"), pursuant to which RCF VI agreed to make available letters of credit up to the aggregate amount of Sixty Million Dollars ($60,000,000) ("$60MM Facility"). All wholly owned Lighthouse Subsidiaries are guarantors of the $60MM Facility except for MBTL, Columbia, and Barlow Point. The aggregate amount of letters of credit supported by RCF VI pursuant to the $60MM Reimbursement Agreement is $22,000,000. On or around September 24, 2020, Atlantic Specialty Insurance Company drew on its letter of credit in the amount of $13,125,000, the amount of which became a "Reimbursement Loan" as that term is defined in the $60MM Reimbursement Agreement. The $60MM Facility is guaranteed and secured pursuant to the RCF VI Security Documents, as defined below.

d.    Loan Agreement dated May 24, 2016, which was amended and restated on June 28, 2019, between Lighthouse (as borrower) and RCF VI and RCF Annex, as lenders and RCF VI as agent (as amended, modified, supplemented, extended or restated from time to time, the "$137.5MM Loan Agreement;" the loans pursuant to the $137.5 Loan Agreement, the "$137.5MM Loan"), whereby RCF VI and RCF Annex loaned to Lighthouse an aggregate of One Hundred Million Dollars ($100,000,000) (the "$100MM Loan"), and RCF VI, through the June 28, 2019 amendment and restatement of the Loan Agreement and several amendments thereto, agreed to lend Lighthouse up to the principal amount of Thirty Seven Million Five Hundred Thousand Dollars ($37,500,000) (the "$37.5MM Loan"). The $137.5MM Loan is guaranteed by all Lighthouse Subsidiaries. The $100MM Loan is guaranteed and secured pursuant to the RCF Security Documents, as defined below, and certain of the RCF VI Security Documents, and the $37.5MM Loan is guaranteed and secured by certain of the RCF VI Security Documents.

ii.    The $137.5MM Loan Agreement, the $55MM Loan Agreement, the $80MM Loan Agreement, and the $60MM Reimbursement Agreement, are collectively referred to as the "Loan Agreements" in this Interim Order. The $137.5MM Loan, the $55MM Loan, $80MM Loan, and $60MM Facility, are collectively referred to as the "Prepetition Loans" in this Interim Order, and amounts owed under Loan Documents or

otherwise in connection with the Prepetition Loans, are collectively referred to as the "Prepetition Obligations" in this Interim Order.

       iii.       Under the relevant provisions of the Loan Agreements, the $137.5MM Loan bears interest at a rate of two and thirty-seven hundredths percent (2.37%) per annum; the $55MM Loan and $80MM Loan bear interest at a rate of two percent (2%) per annum; and the Reimbursement Loan bears interest at a rate of twelve percent (12%) per annum. Default interest under the Prepetition Loans is equal to the contract rate plus five percent (5%).

       iv.    ***The Prepetition Security Documents.***  The Prepetition Loans made by RCF V are guaranteed and secured pursuant to the following agreements, instruments, and documents (together, the "RCF V Security Documents"):

    a.   Guarantees from certain guarantors ("Guarantors")[4] dated November 14, 2011, May 24, 2013, and December 22, 2014.

    b.   Security Agreements from Borrower and the Guarantors dated November 14, 2011, May 24, 2013, and December 22, 2014, which grant a security interest in the Collateral (as defined therein and including all personal property of each Borrower and Guarantor).

    c.   Equity Interest Pledge Agreements from pledgors including Lighthouse, LHR Coal, and LHR Infrastructure, dated November 14, 2011, as amended, and Decker Holding, dated May 24, 2013, as amended.

    d.   Acknowledgements and Undertakings from Guarantors dated November 11, 2011, May 24, 2013, and December 22, 2014.

    e.   UCC-1 Financing Statements filed with the Delaware, Montana, and Wyoming Secretaries of State.

---

[4] As defined in the Prepetition Security Documents, LHR Coal, LHR Infrastructure, Lighthouse Products, LLC, Gulf States, KCP Properties, KCP, Big Horn, Rosebud, Decker Holding, Decker Coal, and Montana Royalty. Lighthouse Products, LLC, a wholly owned subsidiary of Lighthouse, is a guarantor under the Loan Agreements but is not a debtor in these proceedings. Capitalized terms not otherwise defined in this order have the meaning given to them in the applicable Prepetition Security Document.

f.  Mortgage, Leasehold Mortgage, Assignment of Rents, Security Agreement, Fixture Filing and As-Extracted Collateral Filing dated June 28, 2019, by Decker Coal Company, LLC, in favor of RCF VI (as agent and lender), RCF V, and RCF Annex, recorded in Big Horn County, Montana, on July 12, 2019, at Book 156, Pages 148-192 (the "<u>Decker Mortgage</u>").

g.  Mortgage, Leasehold Mortgage, Assignment of Rents, Security Agreement, Fixture Filing and As-Extracted Collateral Filing dated June 28, 2019, by Big Horn Coal Company, LLC, in favor of RCF VI (as agent and lender), RCF V, and RCF Annex, recorded in Big Horn County, Montana, on July 12, 2019, at Book 156, Pages 115-147 (the "<u>Big Horn Mortgage</u>").

The Prepetition Loans made by RCF VI are guaranteed and secured pursuant to the following agreements, instruments, and documents (the "<u>RCF VI Security Documents</u>"):

a.  Guarantees from the Guarantors incorporated into $80MM Loan Agreement and from all Guarantors and MBTL, Barlow Point, and Columbia Land (together, "<u>Additional Guarantors</u>") incorporated into the $137.5MM Loan Agreement.

b.  Security Agreement dated December 22, 2014, signed by each of Borrower and the Guarantors, which grants a security interest in the Collateral (as defined therein and including all personal property of each Borrower and Guarantor).

c.  Security Agreement dated May 24, 2016, signed by each of Borrower and the Guarantors, and Joinder Agreement dated June 28, 2019, signed by the Additional Guarantors which grants a security interest in all Collateral (as defined therein and including all personal property of each Borrower, Guarantor, and Additional Guarantor).

d.  Equity Interest Pledge Agreements from Borrower, LHR Coal, LHR Infrastructure, and Decker Holding, dated December 22, 2014 dated May 24, 2016, and from MBTL, dated June 28, 2019.

e.  Acknowledgements and Undertakings from the Guarantors, dated December 22, 2014 and May 24, 2016, and from the Additional Guarantors, dated June 28, 2019.

f.  UCC-1 Financing Statements filed with the Delaware, Montana, and Wyoming Secretaries of State.

g.  The Decker Mortgage.

h.  The Big Horn Mortgage.

The Prepetition Loans made by RCF Annex are guaranteed and secured pursuant to the following agreements, instruments, and documents (the "RCF Annex Security Documents"):

   a. Guarantee by Guarantors and Additional Guarantors incorporated into $137.5MM Loan Agreement.

   b. The Decker Mortgage.

   c. The Big Horn Mortgage.

   d. Certain other RCF VI Security Documents filed by RCF VI, as agent, on behalf of RCF Annex.

The RCF V Security Documents, the RCF VI Security Documents, and the RCF Annex Security Documents are referred to herein as the "Prepetition Security Documents" and, along with the Loan Agreements and all other agreements, instruments, and documents executed in connection therewith or otherwise relating thereto are collectively referred to as the "Loan Documents."

   v.       The $137.5MM Loan, the $55MM Loan, and the $80MM Loan provided for a maturity date of September 30, 2020 and the amounts drawn under the $60MM Facility were due and payable as of no later than October 7, 2020 (each a "Maturity Date" and, together, the "Maturity Dates"). The Debtors failed to repay the amounts due and owing under the Prepetition Loans on or after the Maturity Dates. On October 1 and 7, 2020, RCF V, RCF VI, and RCF V Annex each sent letters to the Debtors notifying them that they deemed the Prepetition Loans, together with any accrued interest, fees and other amounts, "due and payable as of September 30, 2020" and as of October 7, 2020, as applicable. As of December 1, 2020, the Prepetition Obligations, including the aggregate

principal indebtedness under the Prepetition Loans, along with interest, fees, and other amounts due and payable, totaled $256,023,552.89.

      vi.      ***Loan Documents, Prepetition Obligations, and Prepetition Liens.***

      a.      The Loan Documents constitute the legal, valid, and binding obligations of the Debtors party thereto and their respective Estates and are enforceable against each Debtor party thereto and its respective Estate in accordance with their terms and otherwise applicable law.

      b.      All Prepetition Obligations are unconditionally due and owing to the Prepetition Secured Lenders by the applicable Debtors under the Loan Documents. All claims by the Prepetition Secured Lenders on account of the Prepetition Obligations are valid and enforceable, shall be fully allowed, and are not subject to any avoidance reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, crossclaims, recoupment, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable law or regulation.

      c.      As provided in the Loan Documents, the Prepetition Secured Lenders have first-priority liens on and security interests in substantially all of the Debtors' assets (as further described in the Prepetition Security Documents, the "Prepetition Collateral"), except for any Permitted Liens (as defined in the Loan Agreements) (collectively, the "Prepetition Liens"). The Prepetition Liens (x) constitute valid, binding, enforceable, and perfected first-priority liens on and security interests in the Prepetition Collateral, subject only to any Permitted Liens; and (y) are not, and shall not be, subject to avoidance, reduction, setoff, recoupment, offset, recharacterization,

subordination (whether equitable, contractual, or otherwise), counterclaims, crossclaims, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable law or regulation.  The Prepetition Secured Lenders have filed UCC-1 Financing Statements and recorded certain mortgages and otherwise perfected the Prepetition Liens.

vii.     ***Approved Budget.***     As set forth in the 13 -week budget that has been approved by the Prepetition Secured Lenders, attached hereto as <u>Appendix A</u> (the "<u>Approved Budget</u>"), as of the Petition Date, the Debtors are holding cash of approximately $1,158,364. The Prepetition Secured Lenders have a first-priority lien on and security interest in all property of the Debtors and their Estates constituting Cash Collateral (as defined below), including, without limitation, all cash contemplated by the Approved Budget, and all of the Debtors' projected post-petition receipts received before and after the Petition Date.

F.     <u>Releases.</u>   The Debtors forever and irrevocably (i) release, discharge, and acquit the Prepetition Secured Lenders, and their former or current officers, employees, directors, affiliates, partners, agents, representatives, owners, members, partners, financial advisors, legal advisors, managers, consultants, accountants, attorneys, and predecessors in interest (collectively, the "<u>Releasees</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, Avoidance Actions (as defined below), indebtedness, obligations, counterclaims, cross-claims, offsets, recoupments, subordinations, recharacterizations, defenses, recoveries, and Challenges, of every type, relating to any aspect of the relationship between the Prepetition Secured Lenders or their affiliates, on the one hand, and the Debtors or their affiliates, on the other hand, arising out of or in any way relating to the

Prepetition Loans, the Prepetition Obligations, the Loan Documents, the transactions contemplated thereunder and hereunder, the Debtors' attempts to restructure the Prepetition Loans, any and all claims and causes of action arising under the Bankruptcy Code, and any and all claims regarding the validity, enforceability, priority, perfection, or avoidability of the liens, security interests, or secured claims of the Prepetition Secured Lenders, including, without limitation, any equitable subordination claims or defenses.

G.      Cash Collateral. For purposes of this Interim Order, the term "Cash Collateral" shall mean and include, without limitation, all "cash collateral," as defined in section 363 of the Bankruptcy Code, of the Prepetition Lenders, whether existing on or after the Petition Date, and shall include, without limitation:

(ii)     all cash proceeds arising from the collection, sale, lease, license, disposition, use, or conversion of any tangible or intangible property, including, without limitation, insurance policies;

(iii)    all of the Debtors' and their Estates' interests in respective deposits, refund claims, and retainers, in each case in or on which the Prepetition Secured Lenders have a lien or replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise;

(iv)    the proceeds of any sale of Prepetition Collateral in connection with any sale; and

(v)     all of the Debtors' cash, including, without limitation, the cash in its deposit accounts, securities accounts, and any other accounts, wherever located, whether as original collateral or as proceeds of other Prepetition Collateral.

H.      <u>Good Cause Shown</u>. Good cause has been shown for entry of this Interim Order. The ability of the Debtors to use cash collateral is vital to the Debtors' Estates and creditors, and the Debtors' agreement to the terms and conditions set forth in this Interim Order is a prudent exercise of the Debtors' sound business judgment. The use of Cash Collateral and all other Prepetition Collateral will enable the Debtors to maximize and preserve the value of the Debtors' businesses pending the completion of certain asset sales and the consummation of a plan to accomplish an orderly liquidation, reclamation, and winddown process, and to satisfy payroll obligations and other working capital and general corporate purposes of the Debtors consistent with the terms set forth in this Interim Order and the Approved Budget. Among other things, entry of this Interim Order is necessary to maximize the value of the Debtors' and their Estates' assets and to avoid immediate and irreparable harm to the Debtors and their Estates and, accordingly, is in the best interests of the Debtors, their Estates, and their creditors.

I.      <u>Immediate Entry of Order</u>. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Local Rule 4001-2(b). The permission granted herein to use Cash Collateral and all other Prepetition Collateral and grant adequate protection is necessary, essential, and appropriate to the preservation of the Debtors' and their Estates' assets. The Court concludes that immediate entry of this Interim Order is in the best interests of the Debtors' Estates and creditors, as its implementation will, among other things, sustain the continued operations of the Debtors' businesses and thereby enhance the Debtors' prospects for a reorganization or a successful sale of substantially all of their assets.

Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and the Prepetition Secured Lenders,

having expressly consented to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.        <u>Disposition</u>. The Motion is hereby GRANTED on an interim basis on the terms set forth in this Interim Order. Any objection to the interim relief sought in the Motion that has not previously been withdrawn or resolved is hereby overruled on its merits. The use of Cash Collateral and other Prepetition Collateral authorized hereunder shall expire without further notice or hearing on the earlier of (a) the date that is thirty-five days after the Petition Date, if the order approving the Motion on a final basis, in a form acceptable to the Prepetition Secured Lenders (the "<u>Final Order</u>") has not been entered by the Court prior to such date; and (b) the Termination Date (as defined below).

**<u>Authorization for Use of Cash Collateral</u>**

2.        <u>Authorization for Use of Cash Collateral</u>.

(a)        The Debtors are hereby authorized to use Prepetition Collateral, including Cash Collateral, in accordance with the Approved Budget, subject to and in accordance with the terms, conditions, and limitations set forth in this Interim Order, without further approval by the Court.

(b)        <u>Approved Budget</u>. The Debtors have delivered the Approved Budget to the Prepetition Secured Lenders. Bi-weekly following entry of this Interim Order, the Debtors shall provide the Prepetition Secured Lenders with an updated budget covering the period through March 1, 2021. Each updated budget shall be in form and substance acceptable to the Prepetition Secured Lenders and shall not be deemed to constitute the "Approved Budget" for purposes of this Interim Order until the Prepetition Secured

13

Lenders' approval of such updated budget has been confirmed by counsel to the Prepetition Secured Lenders. The Debtors shall provide to the Prepetition Secured Lenders financial reporting with respect to the Debtors as provided in this Interim Order. Cash Collateral used under this Interim Order shall be used by the Debtors only in accordance with the Approved Budget and this Interim Order.

**Adequate Protection**

3.                 <u>Adequate Protection for Prepetition Secured Lenders</u>. The Prepetition Secured Lenders have consented to the Debtors' use of Cash Collateral upon the terms set forth in the Approved Budget and this Interim Order. As additional adequate protection against, and to the extent of, any diminution in value of the Prepetition Liens occurring from and after the Petition Date (the "<u>Adequate Protection Claims</u>"), whether or not such diminution in value results from the sale, lease, or use by the Debtors of the Prepetition Collateral (including, without limitation, Cash Collateral), the stay of enforcement of any pre-petition lien or security interest arising from section 362 of the Bankruptcy Code, or otherwise (each such diminution in value, a "<u>Diminution in Value</u>"), the Prepetition Secured Lenders are hereby granted the following, which shall be referred to collectively as the "<u>Adequate Protection Rights</u>":

(a)         <u>Replacement Liens.</u> To secure the Adequate Protection Claims, and pursuant to sections 361(2) and 363(c)(2) and (e) of the Bankruptcy Code, the Prepetition Secured Lenders are hereby granted valid, binding, continuing, enforceable, fully-perfected, and nonvoidable postpetition security interests and liens, subject only to the Carve-Out and the rights of any party other than the Debtors to assert a Challenge as set forth in paragraph 10 herein, as follows (collectively, the "<u>Replacement Liens</u>"):

(i)      *First-Priority Replacement Liens on Unencumbered Property*. Replacement Liens on all of the Debtors' and the Estates' right, title, and interest in and to all tangible and intangible assets and property, including, without limitation, all prepetition and postpetition assets and property of the Debtors or of the Estates, and all products and proceeds thereof, and proceeds of proceeds, in each case whether existing on or as of the Petition Date or thereafter acquired, and in each case that are not subject to any (x) valid, binding, enforceable, duly perfected, and non-avoidable liens in existence on or as of the Petition Date, or (y) valid, binding, enforceable, and non-avoidable liens in existence as of the Petition Date that are duly perfected after the Petition Date as and to the extent permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property"), including, without limitation, all accounts, receivables, rights to payment, cash, general intangibles, payment intangibles, instruments, contracts, securities, investment property, chattel paper, owned real estate, real property leaseholds, goods, inventory, fixtures, machinery, equipment, deposit accounts, securities accounts, patents, copyrights, trademarks, trade names, rights under license agreements (either as licensor or as licensee), intellectual property of any kind, claims and causes of action (including, without limitation, those arising under section 549 of the Bankruptcy Code), commercial tort claims, the proceeds of all of the foregoing, and proceeds of such proceeds; *provided* that the Unencumbered Property shall not include the Avoidance Actions, but the Unencumbered Property shall include, without limitation, and the Replacement Liens shall attach to, any and all payments, judgments, settlements, property, and proceeds avoided or recovered on account of, or in respect of, any and all Avoidance Actions; *provided*, *further*, that the collateral under this clause 3(a)(i) shall not

15

include any contract, license, or lease (other than Prepetition Collateral or Cash Collateral) upon which, and solely to the extent that, the grant of a Replacement Lien as contemplated in this Interim Order would constitute a default or event of default under such contract, license, or lease (and such default would not be excused or rendered ineffective by operation of the Bankruptcy Code or applicable non-bankruptcy law), but the collateral under this clause 3(a)(i) shall in any event include, without limitation, all collections on account of, or proceeds in respect of, any such contract, license, or lease.

(ii)     *Replacement Liens Junior to Certain Senior Existing Liens*. Replacement Liens on all of the Debtors' and the Estates' right, title, and interest in and to tangible and intangible assets and property (*other than* the property described in clause (i) or clause (iii) of this paragraph 3(a)), including, without limitation, all prepetition and postpetition assets and property of the Debtors or of the Estates, and all products and proceeds thereof, and proceeds of proceeds, in each case whether existing on or as of the Petition date or thereafter acquired, and in each case that are subject to any (x) valid, binding, enforceable, duly perfected, and non-avoidable liens in existence on or as of the Petition Date in favor of a creditor other than the Prepetition Secured Lenders, or (y) valid, binding, enforceable, and non-avoidable liens in favor of a creditor other than the Prepetition Secured Lenders in existence as of the Petition Date that are duly perfected after the Petition Date as and to the extent permitted by section 546(b) of the Bankruptcy Code (the liens in clauses (x) and (y) above, collectively, but only to the extent senior in priority to the Prepetition Liens of the Prepetition Lenders, the "Senior Existing Liens"), including, without limitation, all accounts, receivables, rights to payment, cash, general intangibles, payment intangibles, instruments, contracts, securities, investment property,

chattel paper, owned real estate, real property leaseholds, goods, inventory, fixtures, machinery, equipment, deposit accounts, securities accounts, patents, copyrights, trademarks, trade names, rights under license agreements (either as licensor or as licensee), intellectual property of any kind, claims and causes of action (excluding Avoidance Actions), commercial tort claims, the proceeds of all of the foregoing, and proceeds of such proceeds; *provided* that such in favor of the Prepetition Secured Lenders shall be junior in priority solely to the extent that the Senior Existing Liens were, as of the Petition Date, senior in priority to the Prepetition Liens in favor of the Prepetition Secured Lenders; *provided*, *further*, that the collateral under this clause 3(a)(ii) shall not include any contract, license, or lease (other than Prepetition Collateral or Cash Collateral) upon which, and solely to the extent that, the grant of a Replacement Lien as contemplated in this Interim Order, would constitute a default or event of default under such contract, license, or lease (and such default would not be excused or rendered ineffective by operation of the Bankruptcy Code or applicable non-bankruptcy law), but the collateral under this clause 3(a)(ii) shall in any event include, without limitation, all collections on account of, or proceeds in respect of, any such contract, license, or lease.

(iii)    *Replacement Liens Senior to Certain Existing Liens of Prepetition Secured Lenders*. Replacement Liens on, and security interests in, all of the Debtors' and the Estates' right, title, and interest in and to all tangible and intangible assets and property, including, without limitation, all prepetition and postpetition assets and property of the Debtors or of the Estates, and all products and proceeds thereof, and proceeds of proceeds, in each case whether existing on or as of the Petition Date or thereafter acquired, including, without limitation, all accounts, receivables, rights to payment, cash,

17

general intangibles, payment intangibles, instruments, contracts, securities, investment property, chattel paper, owned real estate, real property leaseholds, goods, inventory, fixtures, machinery, equipment, deposit accounts, securities accounts, patents, copyrights, trademarks, trade names, rights under license agreements (either as licensor or as licensee), intellectual property of any kind, claims and causes of action (excluding Avoidance Actions), commercial tort claims, the proceeds of all of the foregoing, and proceeds of such proceeds; *provided* that such liens and security interests shall not prime any Existing Senior Liens senior in priority to the Prepetition Liens of the Prepetition Secured Lenders; *provided*, *further*, that the collateral under this clause 3(a)(iii) shall not include any contract, license, or lease (other than Prepetition Collateral or Cash Collateral) upon which, and solely to the extent that, the grant of a Replacement Lien as contemplated in this Interim Order, would constitute a default or event of default under such contract, license, or lease (and such default would not be excused or rendered ineffective by operation of the Bankruptcy Code or applicable non-bankruptcy law), but the collateral under this clause 3(a)(3) shall in any event include, without limitation, all collections on account of, or proceeds in respect of, any such contract, license, or lease.

(b) *Waiver of Right to Surcharge.* Subject to and effective upon the entry of the Final Cash Collateral Order, as a further condition to the Debtors' authorization to use the Cash Collateral, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Case or any Successor Case) shall be deemed to have waived any rights, benefits or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the Prepetition Secured Lenders, the Prepetition Liens, the Prepetition Collateral, or the Adequate Protection Liens. Except for the Carve-Out, nothing

18

contained in this Interim Order in the Final Cash Collateral Order shall be deemed a consent by the Prepetition Secured Lenders to any charge, lien, assessment or claim against, or in respect of, the Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.

(c)     *Status of Replacement Liens*. The Replacement Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of any Debtor's Estate under section 551 of the Bankruptcy Code, or (B) any lien or security interest arising after the Petition Date, subject to the Carve-Out; or (ii) except as otherwise explicitly set forth in clause (i), clause (ii), or clause (iii) of this paragraph 3(a), subordinated to, or made *pari passu* with, any other lien or security interest, now or hereafter existing and whether authorized under sections 363 or 364 of the Bankruptcy Code or otherwise.

(d)     *Superpriority Claims.*  As further adequate protection for the Adequate Protection Claims, subject only to the Replacement Liens, the Prepetition Liens, the Senior Existing Liens, and the Carve-Out, the Prepetition Secured Lenders shall have allowed senior administrative expense claims against the Debtors and their Estate (the "Superpriority Claims") (without the need to file any proof of claim) with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors or their Estates, now existing or hereafter arising, of any kind whatsoever, including, without limitation, those arising under 11 U.S.C. §§ 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 726, 1113, and 1114, which allowed Superpriority Claims, if paid under a confirmed chapter 11 plan, shall be treated and paid pursuant to 11 U.S.C. § 1129(a)(9)(A) or as otherwise agreed by the Prepetition Secured Lenders and which shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and their Estates and all proceeds thereof, including any distribution received by the Debtors or their Estates from any of the

Debtors' subsidiaries or their respective Estates, but  excluding any proceeds or property recovered through an Avoidance Action. Except as set forth in, or permitted by, this Interim Order, no other super-priority claims shall be granted or allowed in these Chapter 11 Cases, and the Superpriority Claims shall be senior in all respects to any superpriority claims granted in the Chapter 11 Cases notwithstanding the foregoing, including, without limitation, on account of any break-up fee or expense reimbursement that may be granted by the Court in connection with any sale of the Debtors' assets.

4.         Consent to Use of Cash Collateral Subject to Adequate Protection Rights. The Prepetition Secured Lenders consent to the use of Cash Collateral to the extent set forth in this Interim Order and the Approved Budget; *provided*, *however*, that (i) such consent is expressly conditioned upon the provision of the Adequate Protection Rights and the entry of this Interim Order (in form and content satisfactory to the Prepetition Secured Lenders in their sole discretion), (ii) such consent shall not be deemed a basis to deny, impair, or alter the Prepetition Secured Lenders' entitlement to the Adequate Protection Rights, and (iii) such consent shall be of no force or effect in the event that this Interim Order is not entered or is vacated or is modified in any respect without the express written consent of the Prepetition Secured Lenders in their sole discretion.

5.         Further Adequate Protection. Nothing in this Interim Order shall, or shall be deemed to, limit, abridge, or otherwise affect the rights of (i) the Prepetition Secured Lenders to request at any time that the Court order the provision of additional or further adequate protection of its interests in the Prepetition Collateral (including, without limitation, the Cash Collateral) as may be appropriate in the event that the Adequate Protection Rights provided herein may be inadequate, and (ii) the Debtors or any other party in interest to object to any such request.

6.          <u>Survival of Replacement Liens, Super Priority Claims, Adequate Protection Claim, and Other Adequate Protection Rights</u>. Without prejudice to the rights of any party other than the Debtors to assert a Challenge as set forth in paragraph 10 herein, the Replacement Liens, the Superpriority Claim, the Adequate Protection Claims, the other Adequate Protection Rights, and all other rights and remedies granted to the Prepetition Secured Lenders under the Interim Order, shall continue in these Chapter 11 Cases and in any successor case under the Bankruptcy Code (including, without limitation, any case under chapter 7 of the Bankruptcy Code, a "<u>Successor Case</u>"), and shall be and remain valid and enforceable (i) against any chapter 11 trustee or examiner appointed in these Chapter 11 Cases, (ii) against any chapter 7 trustee appointed in a Successor Case, (iii) against any other representative of the estate or any assignee of assets or rights of the Estate, and (iv) upon any conversion or dismissal of these Chapter 11 Cases or any Successor Case; and all Replacement Liens and security interests shall maintain their perfected status and respective priority as provided in this Interim Order until the Adequate Protection Claims have been indefeasibly paid in full in cash and satisfied.

7.          <u>Credit Bid</u>. Nothing in this Interim Order shall be construed to deprive the Prepetition Secured Lenders of the right to "credit bid" the Prepetition Obligations pursuant to section 363(k) and/or section 1129(b)(2)(A)(ii) of the Bankruptcy Code.

<b><u>Carve-Out; Restrictions on Use of Funds</u></b>

8.          <u>Carve-Out</u>.

(a)          The Replacement Liens and Superpriority Claim shall be subject to, and proceeds of any collateral therefor may be used to pay only (the "<u>Carve-Out</u>"): (i) unpaid fees and expenses required to be paid by the Debtors to the Clerk of the Court or to the Office of the

21

United States Trustee (the "UST") under 28 U.S.C. § 1930(a)(6); (ii) to the extent (x) provided

for in the Approved Budget, and (y) allowed by the Court, whether by interim order, procedural

order, or otherwise, but subject to final allowance by the Court, the fees and expenses (the

"Allowed Professional Fees") incurred by persons or firms retained by the Debtor pursuant to

section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any appointed

committee pursuant to Bankruptcy Code section 328 or 1103 (the "Committee Professionals"

and, together with the Debtor Professionals, the "Professional Persons") at any time before

delivery by any Prepetition Secured Lender of a Carve-Out Trigger Notice (as defined below),

whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iii)

Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed

$200,000.00 incurred after the first business day following delivery by any Prepetition Secured

Lender of the Carve-Out Trigger Notice, to the extent (x) provided for in the Approved Budget,

and (y) allowed at any time, whether by interim order, procedural order, or otherwise, but subject

to final allowance by the Court (the amounts set forth in this clause (iii) being the "Post-Carve-

Out Trigger Notice Cap").  For purposes of the foregoing, "Carve-Out Trigger Notice" shall

mean a written notice delivered by email (or other electronic means) by any Prepetition Secured

Lender to the Debtors, Debtors' counsel, the UST, and counsel to the Creditors' Committee (if

any) advising that a Termination Event (as defined below) has occurred and stating that the Post-

Carve-Out Trigger Notice Cap has been invoked.  Any payment of Allowed Professional Fees to

Professional Persons prior to the delivery of a Carve-Out Trigger Notice shall not reduce the

Post-Carve-Out Trigger Notice Cap.  Allowed Professional Fees incurred after the delivery of a

Carve-Out Triger Notice shall reduce the Post-Carve-Out Trigger Notice Cap on a pro rata basis.

(b)      Starting with the first full calendar week following the Petition Date, each

Estate Professional shall deliver to the Debtors and the Prepetition Secured Lenders a statement

(each such statement, a "Weekly Statement") setting forth a good-faith estimate (the "Estimated

Fees and Expenses") of the amount of unpaid fees and expenses incurred during the preceding

week by such Estate Professional (through Saturday of such week, the "Calculation Date"),

along with a good faith estimate of the cumulative total amount of unreimbursed fees and

expenses incurred through the applicable Calculation Date and a statement of the amount of such

fees and expenses that have been paid to date by the Debtors (the "Cumulative Total Unpaid

Fees and Expenses") in accordance with the Approved Budget and this Interim Order for the

applicable period.

(c)      To the extent provided for in the Approved Budget and this Interim Order,

the Debtors shall, on a weekly basis, transfer cash proceeds in an amount equal to the

Cumulative Total Unpaid Fees and Expenses included in the most recent Weekly Statement

timely received by the Debtors less the amount of cash already deposited into a segregated

account not subject to the control of the Prepetition Secured Lenders, or any Prepetition Secured

Party (the "Professional Fees Escrow Account"). The Debtors shall use funds held in the

Professional Fees Escrow Account exclusively to pay Allowed Professional Fees as they become

allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules,

the Approved Budget, this Interim Order, and any other interim or final orders of the Court,

23

subject to approval by a final order; *provided* that the Debtors' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account. Funds transferred to the Professional Fees Escrow Account shall be held in trust for and exclusively available for the payment of any fees and expenses of the Estate Professionals, including with respect to obligations arising out of the Carve Out.

(d)     Nothing contained in this Interim Order shall be construed: (i) to exempt those persons seeking Allowed Professional Fees who may receive interim compensation payments or reimbursement of expenses pursuant to any Court-approved procedure, from all provisions of bankruptcy law otherwise applicable, including, without limitation, any requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate final fee applications, and, if applicable, any subsequent order of this Court requiring that such payments be disgorged, or (ii) as consent to the allowance of any fees and expenses referred to above; and shall not affect any right of the Prepetition Secured Lenders to object to the reasonableness of such amounts or to object on any other basis.

(e)     Prior to or in accordance with the entry of any order dismissing these Chapter 11 Cases, each Professional Person that incurs Allowed Professional Fees shall have an opportunity to seek allowance of all Allowed Professional Fees incurred by such Professional Person prior to the effective date of any such dismissal.

(f)     For avoidance of doubt, the Prepetition Secured Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Case.

24

9.    <u>Restrictions on Use of Cash Collateral</u>.

(a)    Notwithstanding anything to the contrary in this Interim Order, no Prepetition Collateral (including, without limitation, Cash Collateral), and no portion of the Carve-Out may be used to pay any fees or expenses or claims for services rendered by any of the professionals retained by the Debtors, by a Creditors' Committee, by any creditor or other party in interest, by any other committee, by any trustee appointed in these Chapter 11 Cases or in a Successor Case, or for any other party to (i) investigate (except as set forth in paragraph 9(b) below), assert, join, commence, support, or prosecute (x) any potential or actual action or claim, counterclaim, cross-claim, action, proceeding, application, motion, objection, setoff, or defense, or (y) any other contested matter or adversary proceeding, in each case seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, the Prepetition Secured Lenders or their property, or any of their officers, directors, employees, agents, attorneys, affiliates, partners, assigns, or successors, with respect to any transaction, occurrence, omission, or action, including, without limitation, (A) any avoidance actions or other actions arising under chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>"); (B) any action relating to any act, omission, or aspect of the relationship between the Prepetition Secured Lenders, on the one hand, and the Debtors or any of their affiliates, on the other; (C) any action with respect to the validity, enforceability, or extent of the Prepetition Loans, the validity, enforceability, extent, or priority of the Prepetition Liens, the Replacement Liens, or the Superpriority Claims, or the validity or enforceability of the Loan Documents; or (D) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the Loan Documents,

the Prepetition Loans, the Prepetition Liens, the Replacement Liens, or the Superpriority Claims; (ii) except as set forth in the Approved Budget, pay any claim of a creditor (as such terms are defined in the Bankruptcy Code) without the prior written consent of the Prepetition Secured Lenders (in its sole and absolute discretion); or (iii) use or seek to use Cash Collateral or sell or otherwise dispose of Prepetition Collateral, unless otherwise expressly provided for in the Approved Budget and permitted by this Interim Order, without the express written consent of the Prepetition Secured Lenders (in their sole and absolute discretion).

(b)     Notwithstanding the foregoing, up to $25,000 in the aggregate of the Carve-Out may be used by the Creditors' Committee to investigate (but not prosecute) the extent, validity, avoidability, and priority of the Prepetition Loans, the Prepetition Liens, or any other claims against the Prepetition Secured Lenders, so long as such investigation occurs within the Challenge Period (as defined below).

10.     <u>Reservation of Certain Third-Party Rights and Bar of Challenges and Claims</u>.

(a)     The Debtors' acknowledgements and stipulations set forth in paragraphs D-E above and the releases set forth in paragraph 11 below (collectively, the "<u>Debtors' Stipulations</u>") are final and binding upon the Debtors in all circumstances upon entry of this Interim Order. The Debtors' Stipulations shall be binding upon each other party in interest, including, without limitation, a Creditors' Committee, unless a Challenge (defined below) is commenced by a Creditors' Committee within the Challenge Period and a final, non-appealable order is entered sustaining any such Challenge.

(b)     "<u>Challenge</u>" and "<u>Challenges</u>" shall mean individually or collectively: (i) an adversary proceeding or contested matter against any or all of the Prepetition Secured Lenders challenging the admissions, stipulations, findings, or releases included in the Debtors' Stipulations, or (ii) an adversary proceeding or contested matter against any or all of the Prepetition Secured Lenders in connection with or related to (A) the Prepetition Loans; (B) the prepetition business relationship between the Prepetition Secured Lenders and the Debtors, or the prepetition conduct of the Prepetition Secured Lenders with respect to the Debtors; (C) alleged prepetition actions or inactions of the Prepetition Secured Lenders arising out of or related to the Prepetition Loans or otherwise, including, without limitation, any claim against the Prepetition Secured Lenders in the nature of an "equitable subordination," "lender liability," "deepening insolvency," or "control person" liability; (D) any avoidance, offset, recoupment, counterclaim, or defense to the Prepetition Loans (including, without limitation, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code), or (E) any avoidance of or challenge (whether pursuant to chapter 5 of the Bankruptcy Code or otherwise) to any transfer made by or on behalf of the Debtors to or for the benefit of the Prepetition Secured Lenders.

(c)     Subject to paragraph 10(f) below, unless otherwise agreed in writing by the Prepetition Secured Lenders, any Challenge under this paragraph must be commenced by a party in interest with standing and requisite authority to bring the Challenge by no *later* than (i) (x) for a Creditors' Committee (if appointed), the latter of the sixtieth (60th) calendar day following the formation of the Creditors' Committee or the seventy-fifth (75th) calendar day following the date of the entry of this Interim Order, or (y) for all other parties (other than the

Debtors) the seventy-fifth (75th) calendar day following the date of entry of this Interim Order, and (ii) any such other or later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in the foregoing clauses (i)(x) or (i)(y) of this paragraph (the time period established by the foregoing clauses (i) and (ii), the "Challenge Period").

(d)     The "Challenge Period Termination Date" shall be (i) if no Challenge is filed during the Challenge Period, the next calendar day after the last day of the Challenge Period or (ii) if a Challenge is filed during the Challenge Period, solely with respect to such Challenge, the next calendar day after the day on which such Challenge is fully and finally adjudicated by a final order or judgment that is subject to no further appeal.

(e)     Except as may otherwise be fully and finally adjudicated before the Challenge Period Termination Date as a result of a timely Challenge, upon the Challenge Period Termination Date and for all purposes, including, without limitation, in these Chapter 11 Cases and any Successor Case, (i) all payments made to or for the benefit of the Prepetition Secured Lenders (whether prior to, on, or after the Petition Date) shall be indefeasible and shall not be subject to counterclaim, offset, recoupment, subordination, recharacterization, defense, recovery, or avoidance; (ii) any and all Challenges by any party whatsoever shall be deemed to be forever released, waived, and barred; (iii) the Prepetition Loans shall be deemed to be (x) secured by a valid, binding, enforceable, duly perfected, and non-avoidable security interest in and lien on the Prepetition Collateral and (to the extent of Diminution in Value) Replacement Liens, and (y) further protected (to the extent of Diminution in Value) by the Superpriority Claim; (iv) the

Prepetition Loans shall be deemed to be a fully allowed claim; and (v) the Debtors' Stipulations shall be binding on all parties whatsoever, including, without limitation, any Creditors' Committee and any trustee or trustees appointed in these Chapter 11 Cases or in any Successor Case.

(f)      If a trustee is appointed in these Chapter 11 Cases, or if these Chapter 11 Cases are converted to a chapter 7 case, in either case prior to the expiration of the Challenge Period, the chapter 11 trustee or chapter 7 trustee, as applicable, shall have until the *later* of (1) the expiration of the Challenge Period or (2) the twentieth (20th) calendar day (or the first business day thereafter if the twentieth calendar day is a Saturday, Sunday, or legal holiday) after the appointment of the chapter 11 trustee or the conversion of these Chapter 11 Cases to a chapter 7 case, as applicable, to commence a Challenge. If a Creditors' Committee has commenced a timely Challenge prior to appointment of a chapter 11 trustee or conversion of these Chapter 11 Cases to a chapter 7 case, the trustee shall be entitled to elect to be substituted in as the plaintiff or moving party and assume control of the Challenge. Whether the trustee commences a Challenge or assumes control of an existing Challenge, the trustee shall not, for the purpose of such Challenge, be bound by the Debtors' Stipulations, except as provided in subparagraph (e) above.

11.      <u>Release</u>. The releases, discharge, waivers, settlements, compromises, and agreements set forth in this paragraph and in paragraph E shall be deemed effective immediately upon entry of this Interim Order and subject only to the Challenge rights set forth in paragraph 10 above. The Debtors and their Estates hereby forever and irrevocably (i) release, discharge,

and acquit the Releasees of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, Avoidance Actions, indebtedness, obligations, counterclaims, cross-claims, offsets, recoupments, subordinations, recharacterizations, defenses, recoveries, and Challenges, of every type, relating to any aspect of the relationship between the Prepetition Secured Lenders or their affiliates, on the one hand, and the Debtors or their affiliates, on the other hand, arising out of or in any way relating to the Prepetition Loans, the Prepetition Obligations, the Loan Documents, the transactions contemplated thereunder or hereunder, the Debtors' attempts to restructure the Prepetition Loans, any and all claims and causes of action arising under the Bankruptcy Code, and any and all claims regarding the validity, enforceability, priority, perfection, or avoidability of the liens, security interests, or secured claims of the Prepetition Secured Lenders, including, without limitation, any equitable subordination claims or defenses; and (ii) waive any and all defenses (including, without limitation, offsets, recoupments, counterclaims, and cross-claims of any nature or kind) as to the validity, enforceability, priority, perfection, or avoidability of the Prepetition Loans, Prepetition Obligations, the Prepetition Liens, the Loan Documents, or the transactions contemplated thereunder and hereunder.

**Termination; Remedies; Modification of Automatic Stay**

12.        <u>Termination</u>. The Debtors' right, and the right of any other representative of the Estate, to use Cash Collateral under this Interim Order shall terminate (other than in respect of the Carve-Out as, and to the limited extent, expressly provided in paragraph 8 of this Interim Order), automatically and without the need for notice or demand by the Prepetition Secured

Lenders or any further order of the Court, on the earliest to occur of the following: (a) thirty-five (35) calendar days after the Petition Date if the Final Order has not been entered by such date; (b) the failure of any of the events set forth in section 6 of the Restructuring Support Agreement, dated December [2], 2020, among Lighthouse, each of the Debtor Subsidiaries party thereto, the Prepetition Secured Lenders, and certain sureties of the Debtors (the "RSA") to occur as and when provided for under the RSA; (c) termination of the RSA in accordance with its terms; (d) the closing date of any sale of substantially all of the assets of the Debtors or the Estates; (e) any of the Debtor's filing a motion seeking appointment of, or the entry of an order appointing, a chapter 11 trustee or of an examiner with expanded powers in these Chapter 11 Cases (having powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (f) any of the Debtor's filing a motion seeking, or the entry of an order granting, the conversion of these Chapter 11 Cases (other than the cases of Debtor LHR Infrastructure and its subsidiaries) to a case under chapter 7 of the Bankruptcy Code; (g) any of the Debtors' filing a motion seeking, or the entry of an order granting, the dismissal of any one or more of these Chapter 11 Cases without the prior written consent of the Prepetition Secured Lenders; (h) any material violation or breach (other than by the Prepetition Secured Lenders), of any of the provisions of this Interim Order; (i) any other (*i.e.* not material) violation or breach by the Debtors of any of the provisions of this Interim Order that is not cured within five (5) business days of written notice from the Prepetition Lenders; and (j) the effective date of any chapter 11 plan in these Chapter 11 Cases that has been confirmed by an order of the Court (any of the events in clauses (a) – (j), a

"Termination Event"). The date on which the earliest Termination Event occurs is referred to as the "Termination Date."

**Miscellaneous**

13.    Additional Perfection Measures.

(a)    Without prejudice to the rights of any party other than the Debtors to assert a Challenge as set forth in paragraph 10 herein, all the Replacement Liens shall be deemed perfected by operation of law immediately upon entry of this Interim Order and shall have, and be entitled to, the priorities as provided in this Interim Order. None of the Debtors and the Prepetition Secured Lenders, shall be required to enter into or obtain any landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers, or any other waiver or consent, or to file or record any financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien, or similar instruments in any domestic or foreign jurisdiction (including, without limitation, trademark, copyright, trade name, or patent filings with the United States Patent and Trademark Office, United States Copyright Office, or any similar domestic or foreign agency with respect to intellectual property, or filings with any other federal, state, local, or foreign agencies or authorities), or obtain consents from any licensor, licensee, or similarly situated party in interest, or take possession of any assets or property, or take any other action in order to validate and to perfect the Replacement Liens or to establish the priorities as provided in this Interim Order.

(b)    If the Prepetition Secured Lenders, in their sole and absolute discretion, choose to take any action to obtain consents from any landlord, licensor, or other party in interest, or to file or record any mortgages, financing statements, notices of lien, or other notices, documents, or instruments, or to otherwise record or perfect such security interests and liens,

such Prepetition Secured Lenders are hereby authorized, but not directed to, take such action and/or to request that the Debtors take such action on its behalf (and the Debtors are hereby authorized to take such action), and relief from the automatic stay of section 362 of the Bankruptcy Code is hereby granted to do so, and:

(i)     any such notices, documents, or instruments shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and

(ii)    no defect in any such act shall affect or impair the validity, perfection, and enforceability of the liens granted under this Interim Order.

(c)     In lieu of obtaining such consents or filing or recording any such mortgages, financing statements, notices of lien, or similar documents or instruments, the Prepetition Secured Lenders may, in their sole and absolute discretion, choose to file or record a true and complete copy of this Interim Order in any place in which any such documents or instruments would or could be filed, together with a description of collateral, and such filing by the Prepetition Secured Lenders shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien, or similar documents or instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

14.     <u>Cash Management Systems</u>. Subject to any cash management order entered (or to be entered) by this Court, the Debtors are authorized and directed to maintain their cash management system in a manner consistent with this Interim Order and any order of this Court concerning the maintenance of the Debtors' cash management system.

15.     <u>Delivery of Reports, Pleadings, and Documents</u>. In addition to all other requirements set forth in this Interim Order, the Debtors shall deliver to the Prepetition Secured Lenders: (i) all financial reports, budgets, and forecasts as reasonably requested from time to

33

time; (ii) all financial reports, budgets, and forecasts delivered by the Debtors to any Creditors' Committee or to the U.S. Trustee; (iii) to the extent reasonably feasible, copies of all proposed pleadings and other papers to be filed by the Debtors with the Court, at least 24 hours in advance of such filing; (iv) copies of all pleadings and other papers filed by the Debtors with the Court, promptly upon such filing; (v) copies of any indications of interest, requests for information, term sheets, proposals, letters of intent, and/or agreements, in each case to the extent received by the Debtors relating to any potential purchase of assets or property of the Estate or any potential plan of reorganization or liquidation; and (vi) copies of any and all other financial or other information or documentation that is reasonably requested by the Prepetition Secured Lenders.

16.        _Variance Report_.  On the second Wednesday following entry of this Interim Order and every second Wednesday thereafter, the Debtors shall provide to the Prepetition Lenders and the Committee, if any, a variance report in form acceptable to the Prepetition Lenders, in their sole and absolute discretion, with respect to the immediately prior two weeks ending the Friday before, setting forth the actual cash receipts and disbursements for such immediately preceding two weeks on a line-item basis and available cash on hand as of the end of such two-week period.

17.        _Access to Books and Records_. The Debtors will (a) keep proper books, records, and accounts in accordance with GAAP, applied consistently, in which full, true, and correct entries shall be made of all dealings and transactions in relation to its businesses and activities; (b) cooperate and consult with the Prepetition Secured Lenders concerning the Debtors' businesses and affairs; (c) provide to the Prepetition Secured Lenders in addition to all data and information expressly required under the provisions of this Interim Order, any additional data and information that are provided by the Debtors to any Creditors' Committee or

34

any Creditors' Committee's legal or financial advisors; (d) permit, upon reasonable notice and at reasonable times, representatives of the Prepetition Secured Lenders to visit and inspect any of the Debtors' properties, to examine and make abstracts or copies from any of its books and records, to conduct a collateral audit and analysis of its inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide views with respect to, the Debtors' affairs, finances, properties, business operations, and accounts with the Prepetition Secured Lenders' officers, employees, consultants, and accountants, as often as may reasonably be desired; and (e) permit representatives of the Prepetition Secured Lenders to consult with the Debtors' management on matters concerning the general status of the Debtors' businesses, financial condition, and operations.

18.     _Successors and Assigns_. The provisions of this Interim Order shall be binding upon, and shall inure to the benefit of, the Debtors, their Estates, the Prepetition Secured Lenders, any Creditors' Committee, and each of their respective successors and assigns, including, without limitation, any trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code, any examiner with expanded powers, any responsible officer, any estate administrator or representative, any liquidation trustee, and any similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code. The provisions of this Interim Order shall also be binding on all of the Debtors' creditors and equity holders, and all other parties in interest.

19.     _Binding Nature of Interim Order_. Unless otherwise consented to in writing by the Prepetition Secured Lenders in their sole and absolute discretion, the rights, remedies, powers, privileges, claims, liens, and priorities of the Prepetition Secured Lenders provided for in this Interim Order or otherwise shall not be modified, altered, eliminated, or impaired in any

manner by any subsequent order or judgment (including, without limitation, by any confirmation order or sale order), by any plan of reorganization or liquidation in these Chapter 11 Cases, by the dismissal or conversion of these Chapter 11 Cases, or in any Successor Case.

20.      No Waiver. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the Prepetition Secured Lenders may have to raise any matter or be heard on any matter brought before the Court. Except as expressly provided in this Interim Order, the Prepetition Secured Lenders retain and reserves all rights and remedies.

21.      Limits on Liability. Nothing in this Interim Order shall in any way be construed or interpreted to impose upon the Prepetition Secured Lenders any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with their restructuring efforts.

22.      Priority of Terms. In the event of any conflict between (a) any term or provision of the Motion, of any other order of this Court, or of any other document or agreement, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, the terms and provisions of this Interim Order shall govern.

23.      No Third-Party Beneficiary. Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor, any equity holder, or any direct, indirect, or incidental beneficiary.

24.      Survival. Without prejudice to the rights of any party other than the Debtors to assert a Challenge as set forth in paragraph 10 herein, except as otherwise provided herein, (a) the protections afforded under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of any order (i) dismissing these Chapter 11 Cases or (ii) converting these Chapter 11 Cases to a case pursuant to chapter 7 of the Bankruptcy Code; and (b) the

36

Replacement Liens and the Superpriority Claim shall remain fully effective, binding, enforceable, duly perfected, and non-avoidable in these Chapter 11 Cases, in any Successor Case, or after any such dismissal. Without prejudice to the rights of any party other than the Debtors to assert a Challenge as set forth in paragraph 10 herein, the Replacement Liens and the Superpriority Claim shall maintain their priorities as provided in this Interim Order, and shall not be modified, altered, eliminated, or impaired in any way by any other financing, extension of credit, incurrence of indebtedness, or by any conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or by dismissal of these Chapter 11 Cases, or by any other act or omission, until all of the Prepetition Loans and Adequate Protection Claims have been indefeasibly paid in full in cash and completely satisfied.

25.     <u>Adequate Notice/Scheduling of Final Hearing</u>. The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(b) and the Local Rules and, under the circumstances, was proper. No further notice of the request for the relief granted at the Interim Hearing is required. The Debtors shall promptly mail copies of this Interim Order and notice of the Final Hearing to: (i) the Office of the United States Trustee; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Securities and Exchange Commission; (v) the Debtors' thirty (30) largest unsecured creditors; (vi) counsel to the Prepetition Secured Lenders; (viii) counsel to the Debtors Sureties, Zurich American Insurance Company, Intact Insurance Specialty Solutions (f/k/a OneBeacon Insurance Company), and ACE Group Holdings, Inc.; (viii) all other known parties asserting a lien against any of the Debtors' assets; and (ix) any party that has as of the date of this Interim Order requested special notice pursuant to Bankruptcy Rule 2002(i). Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with

particularity the grounds thereof, and shall be filed with the Court and served so as to be *actually received* no later than seven (7) days prior to the Final Hearing at 4:00 p.m. (Eastern) by the following: (i) proposed counsel to the Debtors, (a) Jackson Kelly PLLC, 100 West Main Street, Suite 700, Lexington, KY 40507, Attn: Mary Elisabeth Naumann (mnaumann@jacksonkelly.com) and Chacey Malhouitre (chacey.malhouitre@jacksonkelly.com), and P.O. Box 553, Charleston, West Virginia 25322, Attn: Elizabeth Amandus Baker (elizabeth.baker@jacksonkelly.com); (b) proposed counsel to the Debtors, Potter Anderson & Corroon LLP, P.O. Box 951, Wilmington, DE, Attn: L. Katherine Good and Aaron H. Stulman (kgood@potteranderson.com; astulman@potteranderson.com); (c) counsel to the Prepetition Secured Lenders, Sullivan Hazeltine Allinson LLC, 919 North Market Street, Suite 410, Wilmington, DE, Attn: Bill Sullivan and Bill Hazeltine (bsullivan@sha-llc.com; whazeltime@sha-llc.com) and Davis Graham & Strubbs LLP, 1550 17th Street, Suite 500, Denver, Co, Attn: Christopher Richardson, Joel Benson, and Kyler Burgi (chris.richardson@dgslaw.com; joel.benson@dgslaw.com; kyler.burgi@dgslaw.com); (d) counsel to Zurich American Insurance Company, Chiesa Shahinian & Giantomasi PC, One Boland Drive, West Orange, NJ 07052, Attn: Scott A. Zuber (szuber@cslaw.com) and Brian J. Kim (bkim@csglaw.com); (e) counsel to Intact Insurance Specialty Solutions (f/k/a OneBeacon Surety Group), Watt, Tieder, Hoffar & Fitzgerald, L.L.P, 10 S. Wacker Drive, Suite 1100, Chicago, IL 60606, Attn: John E. Sabastian (hsebastian@wattieder.com); (f) counsel to Westchester Fire Insurance Company, Manier & Herod, P.C., 1201 Demonbreun Street, Suite 900, Nashville, TN 37203, Attn: Michael E. Collins (mcollins@manierherod.com);and (g) if any statutory committee has been appointed in these

Chapter 11 Cases, counsel to such committee. The Court shall conduct a Final Hearing on the Motion commencing on **_____, 2020 at \_\_\_\_:\_\_\_\_ (prevailing Eastern Time).**

26.     <u>Immediate Binding Effect</u>. This Interim Order shall not be stayed and shall be valid and fully effective immediately upon entry, notwithstanding the possible application of Bankruptcy Rules 4001(a)(3), 6004(h), 7062, and 9014, or otherwise, and the Clerk of the Court is hereby directed immediately to enter this Interim Order on the Court's docket in these Chapter 11 Cases.

27.     <u>Proof of Claim</u>. The Prepetition Secured Lenders shall not be required to file a proof of claim in these Chapter 11 Cases or in any Successor Case. The Debtors' Stipulations shall be deemed to constitute a timely filed proof of secured claim for the Prepetition Secured Lenders upon entry of the Interim Order, and the Prepetition Secured Lenders shall be treated under section 502(a) of the Bankruptcy Code as though it had filed a timely proof of claim, notwithstanding any order entered by the Court concerning the establishment of a bar date for the filing of proofs of claim in these Chapter 11 Cases or in any Successor Case. The Prepetition Secured Lenders are hereby authorized and entitled, in their sole discretion, but not required, to file a proof of claim in these Chapter 11 Cases or in any Successor Case.

28.     <u>Retention of Jurisdiction</u>. This Court shall retain exclusive jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order.

Dated: December \_\_\_, 2020

_____

United States Bankruptcy Judge

# **APPENDIX A**

**13-Week Budget**

LHR - 2020 Consolidated Ch11 DIP Budget week ending 11.21.20_vCash Collateral.xlsx

Lighthouse Resources, Inc.
DIP Budget - Consolidated
($ in '000s)

| | -3 Actual 11/14/20 | -2 Actual 11/21/20 | -1 Fcst 11/28/20 | 1 Fcst 12/5/20 | 2 Fcst 12/12/20 | 3 Fcst 12/19/20 | 4 Fcst 12/26/20 | 5 Fcst 1/2/21 | 6 Fcst 1/9/21 | 7 Fcst 1/16/21 | 8 Fcst 1/23/21 | 9 Fcst 1/30/21 | 10 Fcst 2/6/21 | 11 Fcst 2/13/21 | 12 Fcst 2/20/21 | 13 Fcst 2/27/21 | Total 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | | | | | | | | | | | | | | | | | |
| Beginning Cash | 2,588 | 1,645 | 2,933 | 943 | 835 | 2,187 | 1,566 | 3,302 | 2,728 | 3,289 | 2,796 | 5,799 | 10,413 | 4,056 | 3,417 | 3,638 | 943 |
| **Operating Receipts** | | | | | | | | | | | | | | | | | |
| Domestic Coal Sales | - | 1,466 | - | - | 2,616 | - | 2,649 | - | 2,235 | - | 3,353 | - | 336 | - | 336 | - | 11,526 |
| Terminal Operations | 0 | 0 | 0 | 106 | 8 | - | - | - | - | - | - | - | - | - | - | - | 113 |
| Management Fees/Other/JV Reimb | 234 | 316 | - | - | - | 280 | - | - | - | 229 | - | - | - | 240 | - | - | 750 |
| Black Butte JV Distributions | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Export Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Receipts** | 234 | 1,782 | 0 | 106 | 2,624 | 280 | 2,649 | - | 2,235 | - | 3,582 | - | 336 | - | 576 | - | 12,388 |
| **Operating Disbursements** | | | | | | | | | | | | | | | | | |
| Payroll | 101 | 290 | 754 | - | 261 | 212 | 95 | 95 | 212 | 95 | 212 | 345 | 152 | 35 | 152 | 502 | 2,369 |
| Benefits | 67 | 111 | 123 | 64 | 64 | 68 | 124 | 84 | 100 | 104 | 100 | 150 | 30 | 34 | 30 | 80 | 1,033 |
| Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Payroll COM | 407 | - | 110 | - | 479 | 377 | 357 | 357 | 265 | 16 | 14 | 14 | 16 | 21 | 21 | 21 | 1,958 |
| Rent | - | - | 11 | - | - | - | - | 11 | - | - | - | 11 | - | - | - | 11 | 32 |
| Bond Premiums | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| BigHorn | - | 2 | 4 | 7 | 6 | 6 | 7 | 6 | 6 | 6 | 6 | 7 | 7 | 6 | 6 | 7 | 83 |
| Taxes | 219 | - | 21 | - | 81 | 20 | 81 | - | 48 | 195 | 15 | 810 | 15 | 8 | 8 | 781 | 2,060 |
| Royalties | - | - | - | - | - | - | - | - | 639 | - | - | - | - | - | - | 135 | 774 |
| Regulatory | - | - | 59 | 2 | 9 | 3 | - | - | 1 | - | - | - | - | 0 | - | - | 14 |
| Directors | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities | 1 | - | 3 | 0 | - | 1 | - | 0 | - | - | - | 1 | 0 | - | 1 | 1 | 4 |
| Professional Fees | 6 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Equipment Leases | 203 | - | - | - | 308 | 179 | - | - | 284 | 24 | 179 | - | - | 284 | 24 | 179 | 1,461 |
| Fuel | - | - | - | - | 5 | 5 | - | - | - | - | - | - | - | - | - | - | 10 |
| Parts/Service | - | - | - | 3 | 3 | - | - | - | - | - | - | - | - | - | - | - | 6 |
| MBTL Permitting/Remediation | - | - | - | 85 | - | - | - | - | - | - | - | - | - | - | - | - | 85 |
| Other Operating Expenses | 9 | 4 | 31 | 45 | 56 | 36 | - | 21 | 23 | 53 | 53 | 49 | 59 | 70 | 63 | 50 | 578 |
| **Total Operating Disbursements** | 1,012 | 407 | 1,115 | 212 | 1,271 | 901 | 664 | 574 | 1,578 | 493 | 580 | 1,386 | 281 | 458 | 305 | 1,765 | 10,468 |
| **Net Operating Cash Flow** | (778) | 1,375 | (1,115) | (106) | 1,352 | (621) | 1,985 | (574) | 657 | (493) | 3,003 | (1,386) | 55 | (458) | 271 | (1,765) | 1,920 |
| **Restructuring-Related Disbursements** | | | | | | | | | | | | | | | | | |
| Bankruptcy Costs | 165 | 87 | 875 | 2 | - | - | 250 | - | 96 | - | - | - | 411 | 181 | 50 | 904 | 1,894 |
| Other Bankruptcy Cash Flow | - | - | - | - | - | - | - | - | - | - | - | (6,000) | 6,000 | - | - | - | - |
| **Total Restructuring-Related Disbursements** | 165 | 87 | 875 | 2 | - | - | 250 | - | 96 | - | - | (6,000) | 6,411 | 181 | 50 | 904 | 1,894 |
| **Net Cash Flow Before Financing** | (943) | 1,288 | (1,990) | (108) | 1,352 | (621) | 1,735 | (574) | 562 | (493) | 3,003 | 4,614 | (6,356) | (639) | 221 | (2,670) | 26 |
| *Cumulative* | | | | (108) | 1,245 | 624 | 2,359 | 1,785 | 2,347 | 1,854 | 4,856 | 9,470 | 3,114 | 2,474 | 2,696 | 26 | |
| **Financing** | | | | | | | | | | | | | | | | | |
| RCF Loan | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Financing Drawdown | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Cash Flow** | $ (943) | $ 1,288 | $ (1,990) | $ (108) | $ 1,352 | $ (621) | $ 1,735 | $ (574) | $ 562 | $ (493) | $ 3,003 | $ 4,614 | $ (6,356) | $ (639) | $ 221 | $ (2,670) | $ 26 |
| Beg. Cash | 2,588 | 1,645 | 2,933 | 943 | 835 | 2,187 | 1,566 | 3,302 | 2,728 | 3,289 | 2,796 | 5,799 | 10,413 | 4,056 | 3,417 | 3,638 | 943 |
| Net Cash Flow | (943) | 1,288 | (1,990) | (108) | 1,352 | (621) | 1,735 | (574) | 562 | (493) | 3,003 | 4,614 | (6,356) | (639) | 221 | (2,670) | 26 |
| **Ending Cash** | 1,645 | 2,933 | 943 | 835 | 2,187 | 1,566 | 3,302 | 2,728 | 3,289 | 2,796 | 5,799 | 10,413 | 4,056 | 3,417 | 3,638 | 969 | 969 |
| Beg. DIP Balance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Drawdown | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending DIP Balance** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Decker Accounts Receivable | 4,078 | 3,803 | 5,265 | 6,383 | 4,884 | 6,002 | 4,471 | 5,588 | 3,521 | 3,689 | 504 | 672 | 504 | 672 | 504 | 672 | |

Pre-Petition / Post-Petition

12/2/2020

**Exhibit B**

**Reclamation Funding Term Sheet**

**Terms and Conditions for a Restructuring and Winding Up of Lighthouse Resources, Inc. and
Certain of its Affiliates
Summary of Key Commercial Terms
December [2], 2020**

**TERM SHEET PROVIDED FOR DISCUSSION PURPOSES ONLY**

This non-binding term sheet (the "Reclamation Funding Term Sheet") is a preliminary summary of the indicative basic terms and conditions for the restructuring and winding up of certain affiliates of Lighthouse Resources, Inc. ("LRI"), including (i) LHR Coal, LLC ("LHR Coal") and its subsidiaries[1] (the "LHR Coal Subsidiaries"), (ii) LHR Infrastructure, LLC and its subsidiaries[2] and (iii) Lighthouse Products, LLC. The restructuring and winding down of LRI and its affiliates, except for Lighthouse Products, LLC, will occur pursuant to a chapter 11 proceeding to be filed in the United States Bankruptcy Court for the District of Delaware (the "Chapter 11 Cases"). This is a preliminary non-binding summary and does not define all of the terms and conditions of the proposed transactions, but is a framework upon which documentation for this transaction would be structured, and is a basis for further discussion and negotiation of such terms among the key creditor constituents of LRI and its affiliates as may be appropriate. Finalization of a transaction, if it occurs, shall be subject to the execution and delivery of satisfactory definitive documentation, and no party will have any rights, obligations or liabilities of any kind or nature until the execution and delivery of satisfactory documentation. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Restructuring Support Agreement.

| | |
|---|---|
| Secured Creditors | Resource Capital Fund V L.P., RCF V Annex Fund L.P., and Resource Capital Fund VI L.P (together, the "Secured Creditors") |
| Sureties | Zurich American Insurance Company ("Zurich"), Atlantic Specialty Insurance Company ("Atlantic"), Westchester Fire Insurance Company ("Westchester") (together, the "Sureties"). |
| Reclamation Trust | A statutory trust created under Delaware law upon the Effective Date of the plan of reorganization of LHR Coal into which 100% of the limited liability company interests of Reorganized LHR Coal will be contributed, such that Reorganized LHR Coal and the Reorganized LHR Coal Subsidiaries will be wholly-owned subsidiaries of the Reclamation Trust. |
| Restructuring Event and Wind Down Bankruptcy | LRI will initiate the Chapter 11 Cases for its subsidiary entities, except for Lighthouse Products, LLC, with the intent of confirming a chapter 11 plan pursuant to which LHR Coal and the LHR Coal Subsidiaries and their respective assets will be placed into or under the control of the Reclamation Trust separate and apart from the other LRI debtor entities which will be separately liquidated in the course of the Chapter 11 Cases. The Secured Creditors will be a beneficiary of the Reclamation |

---

[1]    The subsidiaries of LHR Coal include KCP, Inc. ("KCP"), Big Horn Coal Company ("Big Horn"), Rosebud Coal Sales Company ("Rosebud"), KCP Properties, Inc. ("KCP Properties") and Decker Holding Co., LLC and its subsidiaries Decker Coal Company, LLC and Montana Royalty Holdings, LLC (the Decker entities shall be referred to herein as "Decker"). KCP owns a 50% joint venture interest in Black Butte Coal Company (the "Black Butte JV").

[2]    The subsidiaries of LHR Infrastructure, LLC ("LHR Infrastructure") including Millennium Bulk Terminals-Longview, LLC ("Millennium") and its subsidiaries Barlow Point Land Company, LLC ("Barlow Point") and Columbia Land Co., LLC ("Columbia"), and Gulf States Bulk Terminals, LLC ("Gulf States").

|  | Trust and the Sureties will have an interest in the Sinking Fund pending completion of all reclamation to be funded from the Sinking Fund and corresponding bond release. The Reclamation Trust will manage and implement the closure and reclamation of the coal mining operations at Decker (the "<u>Decker Mine</u>"). The Black Butte JV, which will not be a debtor in any of these Chapter 11 Cases, will continue to operate with a portion of its cash flow being used to assist in the costs of reclamation at the Decker Mine and the Black Butte mine and a portion being paid to the Secured Creditors. The Sureties will be entitled to monies within the Sinking Fund in the event of a termination of the Reclamation Trust prior to completion of all contemplated reclamation to be funded by the Sinking Fund and otherwise upon terms to be negotiated by the parties in the Definitive Documents. |
|---|---|
| Capital Contribution | The Sureties currently control $62,265,000 in collateral which supports their issued and outstanding bonds supporting the Decker and Black Butte mine operations (collectively, the "<u>Surety Bond Collateral</u>"). |
|  | Upon the occurrence of the effective date with respect to the plan of reorganization for LHR Coal and the LHR Coal Subsidiaries (the "<u>Effective Date</u>"), and the creation of the Reclamation Trust effective as of the Effective Date, Sureties will capitalize Reorganized LHR Coal with the amount of $3,000,000 to be used as working capital, funded by the Sureties of a *pro rata* amount of Surety Bond Collateral. |
|  | Upon the commencement of the implementation of a reclamation plan for the Decker Mine, which plan shall be in form and substance acceptable to the Debtors, the Secured Creditors, and the Sureties, and approved by all applicable regulatory and governmental entities (including, without limitation, the State of Montana) (such approved reclamation plan, the "<u>Decker Reclamation Plan</u>"), the remaining bond collateral pledged or otherwise encumbered for the benefit of the Sureties shall be contributed to the Reclamation Trust to form the Sinking Fund (as hereinafter defined), up to an amount of $59,265,000 (plus any interest earnings thereon) in the form of cash and letters of credit, to be contributed into the Sinking Fund at such times, in such amounts and upon satisfaction of certain conditions, to be agreed upon by the parties in the Definitive Documents. Unless otherwise agreed by the surety, each surety shall not be required to contribute its collateral to the Trust/Sinking Fund unless the applicable bond obligees agree to release such surety from liability on the applicable bonds on a dollar for dollar basis. |
|  | The funds in the Sinking Fund shall be used in accordance with the terms of the Definitive Documents and a budget agreed upon by the Debtors, the Secured Creditors, and the Sureties for the Decker Reclamation Plan and the reclamation of the Black Butte mine, which budget shall be updated by the parties in a process to be agreed upon in the agreement governing the Reclamation Trust. |
| Decker Reclamation Plan | Within three months of the Effective Date, the Reclamation Trust and/or Reorganized LHR Coal will prepare the Decker Reclamation Plan for approval by the State of Montana. The implementation of the Decker Reclamation Plan and the reclamation of the Black Butte mine will be funded by a segregated account established by the Reclamation Trust (the "<u>Sinking Fund</u>") to receive the proceeds of (i) the Surety Bond Collateral, to the extent released and contributed to the Sinking Fund and (ii) by a dedication of portion of the distributable income generated by the Black Butte JV. The Decker Reclamation Plan will be administered by the Reclamation Trust through Reorganized LHR Coal. |

2

| LHR Coal Management Fees | Reorganized LHR Coal will be paid the Black Butte Management Fee from the Black Butte JV as defined within the existing Black Butte joint venture agreement with such amounts dedicated to funding Reorganized LHR Coal as it proceeds with the Decker Reclamation Plan. |
| --- | --- |
| | Additionally, Reorganized LHR Coal will be entitled to a $1,000,000 management fee from the Sinking Fund in the event that Reorganized LHR Coal's cash balance falls below $2,000,000 at the end of any fiscal year, with such management fee used to offset shared corporate expenses associated with implementing the Decker Reclamation Plan. |
| KCP, Inc. Distributions | The Black Butte JV will not be a debtor in the Chapter 11 Cases and will continue to operate its mine and fulfill its contractual obligations. Distributions from Black Butte to KCP will be made as follows: <br><br> 1) 40% will be distributed by KCP to the Secured Creditors, and <br> 2) the remaining 60% will be distributed by KCP to the Sinking Fund for implementation of the Decker Reclamation Plan and reclamation of the Black Butte mine when it ceases operation. <br><br> These distribution percentages will apply until the Stage 1 Release (to be defined in the Decker Reclamation Plan) under the Decker Reclamation Plan has been achieved. Once the Stage 1 Release has been achieved, the Black Butte JV distributions will be split 50/50 between the Secured Creditors and the Sinking Fund until the Sinking Fund Cap (as hereinafter defined) has been achieved. Once the Sinking Fund Cap is achieved, the remaining KCP distributions with be paid 100% to the Secured Creditors. The parties will negotiate a methodology to confirm the amounts distributed based on the percentages set forth above to be included in the Definitive Documents. |
| Surety Indemnification Agreements | At the Effective Date, the Reclamation Trust, the Reorganized LHR Coal and the Reorganized LHR Coal Subsidiaries shall enter into additional or amended indemnity agreements (collectively, the "Additional or Amended Indemnity Agreements") between the Reclamation Trust, the Reorganized LHR Coal, and the Reorganized LHR Coal Subsidiaries, on the one hand, and the Sureties, on the other hand, regarding the bonds issued by the Sureties with respect to the Decker Mine and the Black Butte mine. <br><br> To the extent not modified or amended by the Additional or Amended Indemnity Agreements, the existing Indemnity Agreements are to be assumed and assigned to the Reclamation Trust, the Reorganized LHR Coal and the Reorganized LHR Coal Subsidiaries in the Chapter 11 Cases, and nothing shall impact, modify or otherwise alter the Sureties' rights under the existing Indemnity Agreements, which rights shall be preserved, unimpaired, and unmodified; provided, however, the Sureties agree that they will not pursue any such rights against Black Butte unless and until there is an anticipatory default or a default under the Plan or other Definitive Document. |
| Sinking Fund | The Sinking Fund will be for the purposes of satisfying: <br><br> 1) Implementation and completion of the Decker Reclamation Plan; <br> 2) Reclamation expenditures associated with KCP's ownership interest in Black Butte and completion of the reclamation plan to be implemented at the Black Butte mine when it ceases operation; |

3

| | |
|---|---|
| | 3) Payment of obligations of the Reclamation Trust, the Reorganized LHR Coal and the Reorganized LHR Coal Subsidiaries under the Indemnity Agreements; and<br>4) Payment of annual surety fees to the Sureties. |
| Sinking Fund Cap | The Sinking Fund will not be entitled to distributions from KCP after the Sinking Fund has cash, letters of credit, or other assets on hand in excess of a an amount to be agreed upon by the Secured Creditors and the Sureties (the "Sinking Fund Cap"), which amount is intended to be an amount sufficient to complete the Decker Reclamation Plan and represent KCP's required contribution to the Black Butte reclamation obligations, taking into account the existing collateral for the Black Butte surety bonds, cash held at Decker and Black Butte and any contributions required and due from the other joint venture interest owner of Black Butte. Beginning two months following the completion of the Reclamation Fund or such reasonable time as is needed to initially establish the Sinking Fund Cap amount, the amount of the Sinking Fund Cap will be evaluated annually. |
| Surety Fees | Annual surety fees will be capped at 0.64% of the aggregate penal sum of all surety bonds issued by the Sureties, other than those issued for Black Butte, until the Sinking Fund Cap has been satisfied. Such rate shall be effective upon the Effective Date of the Plan and shall be paid from the Sinking Fund upon the approval of the Decker Reclamation Plan, and annually thereafter upon the anniversary of the Effective Date of the Plan or as otherwise agreed upon by the parties. Outstanding unpaid annual surety premiums as of the date of the Restructuring Support Agreement or otherwise due and payable prior to the Effective Date of the Plan shall be pro-rated for the period prior to the Effective Date of the Plan and paid, at the prior premium rate, from the Sinking Fund upon the approval of the Decker Reclamation Plan. |
| Miscellaneous Asset Sales | Proceeds of sales of assets used by Reorganized LHR Coal and the Reorganized LHR Subsidiaries in reclamation activities will go to the Sinking Fund.[3] Proceeds from the sale of other assets of Reorganized LHR Coal and the Reorganized LHR Coal Subsidiaries will be distributed as follows (i) 20% to the Sinking Fund until the Sinking Fund Cap is achieved and (ii) 80% to the Secured Creditors. |
| Expenses | All expenses for each associated party will be at their own cost, except it is expressly understood and agreed to that nothing herein shall modify, impact or otherwise alter the Sureties' rights under the existing Indemnity Agreements or the Additional or Amended Indemnity Agreements. |

---

[3]     Such assets include: 5 Komatsu 830 trucks; 1 Komatsu 785 truck, 1 Komatsu PC-5500 shovel; and 1 Bucyrus Erie 1570 Dragline.

4823-5174-4211.v6

**<u>Exhibit C</u>**

**Trust Term Sheet**

### TRUST TERM SHEET
**December 2, 2020**

This non-binding term sheet (the "**Trust Term Sheet**") is a preliminary summary of the indicative basic terms and conditions for the structure and operation of the Reclamation Trust that will hold limited liability company interests in Reorganized LHR Coal, effectuate the reclamation and remediation of the Decker Mine and the Black Butte Mine, and to distribute assets to certain creditors. This Trust Term Sheet sets forth the non-binding preliminary understanding of the Parties in connection with the Debtors' and the Consenting Stakeholders' entry into that certain Restructuring Support Agreement, dated as of December 2, 2020 (as may be further amended, supplemented or modified pursuant to the terms thereof, the "**Restructuring Support Agreement**"),[1] to which this Trust Term Sheet is attached as <u>Exhibit C</u>.

This Trust Term Sheet does not include a description of all of the terms, conditions, and other provisions that will to be contained in the Definitive Documents, which will remain subject to negotiation and completion in accordance with the Restructuring Support Agreement and applicable bankruptcy law. Absent agreement by the Parties, the Definitive Documents will not contain any material terms or conditions that are inconsistent in any material respect with the results of the negotiations of the Parties based upon this Trust Term Sheet or the Restructuring Support Agreement.

| **Debtors** | LRI and the Subsidiaries |
|---|---|
| **Consenting Stakeholders** | The Prepetition Secured Lenders and the Sureties |
| **LHR Coal** | A limited liability company owning KCP, Inc., Big Horn Coal Company, Rosebud Coal Sales Company, KCP Properties, Inc., Decker Holding Co., LLC, Decker Coal Company, LLC, and Montana Royalty Holdings, LLC (the "**LHR Coal Subsidiaries**"). Pursuant to the Plan, LHR Coal and the LHR Coal Subsidiaries shall be reorganized (respectively, "**Reorganized LHR Coal**" and the "**Reorganized LHR Coal Subsidiaries**" and, together, the "**Reorganized LHR Coal Entities**"). |
| **Vesting of Assets** | On the Plan Effective Date, (a) all assets of LHR Coal and the LHR Coal Subsidiaries shall vest in Reorganized LHR Coal and the Reorganized LHR Coal Subsidiaries, respectively, and (b) an amount of $3 million shall vest in Reorganized LHR Coal, to be funded by cash or other assets of the Reorganized LHR Entities that consist of collateral which secures the obligations of the Reorganized LHR Coal Entities and/or Black Butte JV in connection with the bonds issued by the Sureties to support the Decker and Black Butte mine. Subsequent to the Plan Effective Date, upon approval of the Decker Reclamation Plan (as hereinafter described) (x) an amount of up to $59.265 million (plus any interest earnings thereon) shall be funded by the Sureties pursuant to the terms of the Decker Reclamation Plan and at times and in the amounts contemplated in the other Definitive Documents, and (y) |

---

[1] Capitalized terms used but not defined in this Trust Term Sheet have the meanings given to such terms in the Restructuring Support Agreement.

| | |
|---|---|
| | additional amounts received from Black Butte JV and as proceeds of the liquidation of any assets of the Reorganized LHR Coal Entities, both during and after the pendency of the Chapter 11 Cases, in each case as may be agreed to by the Parties in the applicable Definitive Documents. |
| **Reclamation Trust** | The Reclamation Trust will be created to hold all of the membership interests (and other equity interests) in Reorganized LHR Coal, oversee the reclamation and remediation of the Decker Mine (the "**Decker Reclamation**"), perform reclamation obligations at the Black Butte Mine associated with the ownership interest in the Black Butte JV, liquidate all remaining assets of the Reorganized LHR Coal Entities insofar as such assets are not or no longer become necessary for the Decker Reclamation or reclamation of the Black Butte Mine, and make distributions to the beneficiaries of the Reclamation Trust.  On the Plan Effective Date, Reorganized LHR Coal shall issue all of its limited liability company interests to the Reclamation Trust.  The Reclamation Trust shall govern Reorganized LHR Coal in accordance with the operating agreement of Reorganized LHR Coal. |
| **Reclamation Trust Beneficiaries** | The Prepetition Secured Lenders, with RCF VI as agent, shall be Class A Beneficiaries of the Reclamation Trust and shall receive all Class A Distributions (as defined below) in full and final satisfaction of their claims against LHR Coal and the LHR Coal Subsidiaries.    The Prepetition Secured Lenders' Class A Beneficiary interests in the Reclamation Trust shall be fully transferable.  A liquidation agent ("**Liquidation Agent**") appointed by the general unsecured creditors of LRI and all of its debtor-subsidiaries (together, the "**GUCs**") shall be the Class B Beneficiary of the Reclamation Trust.  The Liquidation Agent shall be responsible for holding Class B Distributions and distributing such amounts pro rata to the GUCs in full and final satisfaction of such creditors' claims. |
| **Governance** | Unless otherwise agreed by the Prepetition Secured Lenders and the Sureties, the Reclamation Trust shall be governed by a five-member board of trustees, comprised initially of (i) one trustee appointed by the Prepetition Secured Lenders ("Lender Trustee"), (ii) one trustee appointed by the Sureties ("Sureties Trustee"), (iii) the Liquidation Agent or its designee, and (iv) two independent trustees appointed by the mutual agreement of the Lender Trustee and the Sureties Trustee. Upon payment in full of the Class B Distributions, the Liquidation Agent or its designee shall cease to be a trustee and shall be replaced by a trustee appointed by the Prepetition Secured Lenders. Administration expenses of the Reclamation Trust will be funded by Reorganized LHR Coal.  The funds in the Sinking Fund shall be used in accordance with the terms of the Definitive Documents and a budget agreed upon by the Debtors, the Secured Creditors, and the Sureties for the Decker Reclamation Plan and the reclamation of the Black Butte |

| | |
|---|---|
| | mine, which budget shall be updated by the Parties in a process to be agreed upon in the agreement governing the Reclamation Trust. |
| **Sinking Fund** | The Reclamation Trust will hold and administer the Sinking Fund (as such term is used in the Reclamation Funding Term Sheet). All distributions from the Black Butte JV to KCP, Inc. and all proceeds from the sale of any assets of the Reorganized LHR Coal Entities will be distributed by the Reorganized LHR Coal Entities to the Reclamation Trust for administration in accordance with terms set forth herein and in the Reclamation Funding Term Sheet. |
| **Class A Distributions** | Class A Distributions shall constitute (i) until achievement of Stage 1 release of Decker reclamation (which shall be defined in a reclamation plan for the Decker Mine, in form and substance acceptable to the Debtors, the Secured Creditors and the Sureties, and approved by all applicable regulatory and governmental entities (including, without limitation, the State of Montana) (such approved reclamation plan, the "**Decker Reclamation Plan**")), (a) 40% of all distributions from the Black Butte JV to KCP, Inc. and (b) 80% of the proceeds of the sale of any assets of the Reorganized LHR Coal Entities other than assets used by the Reorganized LHR Coal Entities in reclamation activities ("Assets")[2], (ii) thereafter, until the Sinking Fund Cap is achieved, (a) 50% of all distributions from the Black Butte JV to KCP, Inc. and (b) 100% of the proceeds of the sale of any Assets; and (iii), upon achievement of both Stage 1 release of Decker reclamation and the Sinking Fund Cap, (a) 100% of all distributions from the Black Butte JV to KCP, Inc. and (b) 100% of the proceeds of the sale of any Assets; in each case *less* the Class B Distributions until the Class B Distribution Cap is satisfied. |
| **Class B Distributions** | Class B Distributions shall consist of $750,000 in cash (the "**Class B Distribution Cap**"). |
| | In the event that Class A Distributions exceed $2,000,000 in any calendar year, any amounts otherwise distributable as Class A Distributions in excess of $2,000,000 million in such calendar year shall be Class B Distributions until the Class B Distribution Cap is satisfied. Upon satisfaction of the Class B Distribution Cap, the Class B Beneficiary shall not be entitled to any further consideration from the Reclamation Trust. |
| **Sureties** | The Sureties will have an interest in the Sinking Fund pending completion of all reclamation to be funded from the Sinking Fund and corresponding bond release. The Sureties will be entitled to monies |

---

[2] The assets used by the Reorganized LHR Coal Entities in reclamation activities include: 5 Komatsu 830 trucks; 1 Komatsu 785 truck; 1 Komatsu PC-5500 shovel; and 1 Bucyrus Erie 1570 Dragline.

4831-7382-7795.v5

| | within the Sinking Fund in the event of a termination of the Reclamation Trust prior to completion of all contemplated reclamation to be funded by the Sinking Fund and otherwise upon terms to be negotiated by the Parties in the Definitive Documents. |
|---|---|

4831-7382-7795.v5